**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|                          |   |                          |
|--------------------------|---|--------------------------|
| NATHANIEL HICKS,         | * |                          |
|     Plaintiff, | * |                  |
| v.                       | * | Case No.: PWG-16-2521    |
| OFFICER GERALD L. FERREYRA, *et al.*, | * |            |
|     Defendants. | * |                 |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION AND ORDER

United States Park Police ("USPP" or "Park Police") Officer Gerald L. Ferreyra pulled over behind a parked vehicle along the side of Interstate 295 North on July 11, 2015 and, when he saw a handgun lying on the front seat, he drew his weapon. The driver, Plaintiff Nathaniel Hicks, a Secret Service agent, showed his credentials and explained that he was on assignment waiting to lead a motorcade that was approaching, and Officer Ferreyra verified that he was indeed an on-duty Secret Service agent. Yet, according to Agent Hicks, Officer Ferreyra continued to detain him unreasonably (by holding onto his credentials and weapons) after Officer Brian Phillips arrived to assist, and after the Park Police's supervisor, whom Officer Ferreyra had asked to report to the scene, arrived, and even after the motorcade passed. And, within minutes after Agent Hicks left the scene, Officer Phillips pulled him over, allegedly for driving erratically and talking on a cellular phone while driving. That second stop was brief but, in Agent Hicks's opinion, still longer than necessary, because Officer Phillips knew that he was a Secret Service agent who was not prohibited from using his phone while driving and, according to Agent Hicks, he was not driving erratically.

Agent Hicks filed suit against Officers Ferreyra and Phillips, alleging that they detained him without "probable cause or even a reasonable, articulable suspicion" twice, in violation of his Fourth Amendment rights (a claim brought pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389, 397 (1971)), and did so as part of a conspiracy to "prevent[] him from discharging duties related to his position as a federal officer," in violation of 42 U.S.C. § 1985(1). Am. Compl. ¶¶ 1, 7–8, 13–14, 57, 65 ECF No. 49-1; *see also* Compl. 1, ECF No. 1. Defendants moved to dismiss or for summary judgment, on the basis of qualified immunity, with regard to the claims stemming from the first detention only. ECF No. 37. I denied the motion because it was not clear at the time that Defendants had probable cause for Plaintiff's continued detention during the first stop. Apr. 11, 2017 Mem. Op. & Order 1, ECF No. 44. Now pending is Defendants' Motion for Summary Judgment on both counts of the Amended Complaint. ECF No. 78.[1] Defendants still have not demonstrated that, based on the record before the Court when viewed in the light most favorable to Agent Hicks, they "act[ed] in objectively reasonable reliance on existing law" in either detention. *See Queen v. Prince George's Cty.*, 188 F. Supp. 3d 535, 541 (D. Md. 2016) (quoting *Rockwell v. Mayor & City Council of Baltimore*, No. RDB-13-3049, 2014 WL 949859, at *8 n.10 (D. Md. Mar. 11, 2014)). Therefore, I once again cannot find that Defendants are entitled to qualified immunity on the *Bivens* claim. But, Agent Hicks has not shown that an exception to the intracorporate conspiracy doctrine applies, and consequently, he cannot prevail on his § 1985(1) civil conspiracy claims as a matter of law. Accordingly, I will grant Defendants' motion as to Count II while denying it as to Count I.

---

[1] The parties fully briefed the motion. ECF Nos. 78-1, 79, 84. A hearing is not necessary. *See* Loc. R. 105.6.

## Background

Agent Hicks sat in his government-assigned 2014 Chevrolet Impala on the shoulder of Interstate 295 North in Maryland on July 11, 2015 at approximately 6:00 a.m., waiting to lead a motorcade for then-Secretary of the U.S. Department of Homeland Security Jeh Johnson.[2] Defs.' Stmt. of Facts ¶¶ 1–2, 12, 15–16, ECF No. 78-1, at 2–8; Pl.'s Opp'n 1–3. According to Hicks, his vehicle had a "police antenna[] on the corner of the hood" and a "strobing bar[] in the middle of the window above the trunk," and its strobing bar and emergency lights were illuminated. Hicks Dep. 85:15–21, 87:2–10, ECF No. 78-4.[3] When Park Police Officer Ferreyra saw the vehicle, he pulled over behind it and approached the vehicle. Defs.' Stmt. of Facts ¶¶ 2–3. Seeing a handgun on the front passenger seat, Officer Ferreyra drew his weapon, after which Agent Hicks quickly identified himself, showed his credentials, and explained that he would be leading a motorcade. *Id.* ¶¶ 7–8, 12, 14, 16; Pl.'s Opp'n 3.

Officer Ferreyra took the credentials and the weapon. Defs.' Stmt. of Facts ¶¶ 11, 14; Pl.'s Opp'n 4. The credentials included a photograph of Agent Hicks and a description of the mission. Ferreyra Dep. 92:12–19, ECF No. 78-3; Hicks Dep. 95:5–15, ECF No. 78-4.[4] They confirmed for

---

[2] For purposes of Defendants' Motion for Summary Judgment, I consider the facts in the light most favorable to Agent Hicks as the non-moving party, drawing all justifiable inferences in his favor. *White v. Pauly*, 137 S. Ct. 548, 550 (2017); *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009). Likewise, to determine the availability of qualified immunity, I take the facts alleged "in the light most favorable to the party asserting the injury," that is, Agent Hicks. *Meyers v. Baltimore Cty.*, 981 F. Supp. 2d 422, 429 (D. Md. 2013) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *receded from on other grounds in Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808 (2009)); *see Queen v. Prince George's Cty.*, 188 F. Supp. 3d 535, 544 (D. Md. 2016) (same).

[3] Agent Hicks's deposition testimony appears at both ECF Nos. 78-4 and 80-1; Officer Phillips's deposition testimony appears at both ECF Nos. 78-5 and 80-6; and Sergeant Wallace's deposition testimony appears at both ECF Nos. 78-8 and 80-9.

[4] Officer Ferreyra's unsealed deposition testimony appears in ECF No. 78-3 and his sealed deposition testimony appears in ECF No. 81-3. Citations for Officer Ferreyra's deposition testimony are to unsealed testimony unless otherwise noted.

Officer Ferreyra that Agent Hicks was a Secret Service agent, although "it was very difficult [for him] to focus" because he "almost shot a police officer," that is, Agent Hicks, before seeing his credentials. Ferreyra Dep. 96:1–97:7. Therefore, he wanted "to go back to [his] cruiser, verify everything [he] need[ed] to verify," including "who [Hicks] is, because [Ferreyra had] had cases with police impersonators before." *Id.* Officer Ferreyra admitted in his deposition that he knew that Agent Hicks "was on duty" as a Secret Service Agent "[w]ell before . . . the motorcade came through, approximately 15 to 20 minutes before." *Id.* at 312:4–18.

At some point early in his encounter with Agent Hicks, Officer Ferreyra called for assistance on scene, and Officer Phillips arrived five to thirteen minutes later. Defs.' Stmt. of Facts ¶ 21; Ferreyra Dep. 146:12–147:14; Phillips Dep. 30:6–16, ECF No. 78-5. Officer Ferreyra promptly informed Officer Phillips that Agent Hicks was a Secret Service agent. Phillips Dep. 35:4–16, 37:10–21; *see also* Ferreyra Dep. 149:4–13 (stating that Phillips "had to have known [that Hicks was a Secret Service Agent], because I think I said it over the air"). Officer Ferreyra also asked his supervisor, Sergeant Timothy Wallace, to report to the scene, and in doing so informed him that "he had a Secret Service agent pulled over on the side of the road." Lt. Wallace Dep. 19:15–21, ECF No. 80-9. Officer Ferreyra testified in his deposition that he wanted his supervisor to assess the situation because he knew there would be an investigation into his decision to draw his weapon, and because he and Agent Hicks had not been in agreement on the circumstances of the encounter. Ferreyra Dep. 111:4–20, ECF No. 81-3 (sealed); *see also* Ferreyra Dep. 145:12–15.

According to Defendants, they "disengaged themselves from Agent Hicks" once Sergeant Wallace arrived, and it was the supervisor who detained Agent Hicks from that point forward. Defs.' Stmt. of Facts ¶¶ 27–28 (citing Ferreyra Dep., 153:19-154:18 (stating that, when Phillips

was talking to Hicks before Wallace arrived, Ferreyra "stood in between . . . [his] cruiser and Hicks's vehicle waiting on the escort, but [he] wasn't going back up there to talk to Hicks anymore, [he] was done with him"); Hicks Dep. 113:20-114:7 ("Once Officer Wallace arrived on the scene and was at my window, Phillips and Ferreyra had retrieved [sic] back to their vehicles."); Phillips Dep. 59:17–22 (stating that, approximately ten minutes after Sergeant Wallace began speaking with Agent Hicks, Officer Phillips and another officer present, Officer Benz, "decided that [they] were going to leave"); Wallace Dep. 53:21–54:13 (stating that, once he arrived at the scene, he did not see Ferreyra interact with Hicks and did not remember Phillips interacting with Hicks; explaining that "[t]ypically, in a scene like this, when a supervisor is on scene, we would treat it like a lot of other situations where, basically, the officer at that point shouldn't have direct contact with the complainant [i.e., Hicks]" and Wallace "become[s] the primary officer" at the scene)). Officer Ferreyra also testified that, even before Sergeant Wallace arrived, he had informed Agent Hicks that he was free to go and returned his credentials and his weapon, but Agent Hicks remained because he was waiting for the motorcade. Ferreyra Dep. 150:5-6, 18-19, 152:11-12 ("He told me he was waiting on an escort there . . . . At that point he already had his gun, he already had his creds. . . . I told him, "You do what you got to do. If you decide to leave, go ahead.").

The parties agree that, forty to sixty minutes after Officer Ferreyra first detained him, it was Sergeant Wallace who informed Agent Hicks that he was free to go. Defs.' Stmt. of Facts ¶¶ 31–32; Pl.'s Opp'n 6. But by then, the motorcade already had passed at about 6:40 a.m. Defs.' Stmt. of Facts ¶¶ 21, 26, 30; Pl.'s Opp'n 5–6. Notably, Agent Hicks testified in his deposition that he was not free to go when the motorcade passed because Defendant Ferreyra did not return his credentials and his weapon until ten to fifteen minutes later. Hicks Dep. 128:4-129:11, 214:14-19.

At 6:59 a.m., within minutes of when Agent Hicks left the scene, Officer Phillips pulled him over again, after observing him driving while talking on a cellular phone. Defs.' Stmt. of Facts ¶¶ 34–36; Pl.'s Opp'n 6; Phillips Dep. 79:5–12, 82:20–83:6. According to Officer Phillips, he also pulled him over because he observed the vehicle "hit the rumble strips, abruptly went back into the right lane and then, later, . . . cross over the white line and basically drive in the shoulder again." Phillips Dep. 80:18-81:15. He testified in his deposition that he left the first stop before Agent Hicks and he did not recognize Agent Hicks or his vehicle when he initially pulled him over a second time. *Id.* at 80:12–18, 141:2–14. Agent Hicks testified that Officer Phillips told him: "I noticed when you departed the scene you were on the phone. It's against the law in the State of Maryland for an officer to be on the phone." Hicks Dep. 138:8–12.

Regardless whether Officer Phillips initially knew it was Agent Hicks's vehicle, the Park Police recognized Agent Hicks "when he approached the vehicle," yet demanded his license and registration. Defs.' Stmt. of Facts ¶¶ 37–38; *see* Pl.'s Opp'n 6–7. He detained him for "a few minutes" and then returned his license and registration and released him. Defs.' Stmt. of Facts ¶¶ 37–8, 40; *see* Pl.'s Opp'n 6. Agent Hicks was too far behind the motorcade to join it. Pl.'s Opp'n 6.

## Standard of Review

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment

demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.*

## Evidence Before the Court

Defendants insist that, "[i]n his Opposition, Agt. Hicks has produced nothing, except for his own self-serving deposition testimony, speculation, or conjecture that contradicts the sworn statements of the other witnesses in this case upon which Defendants' Motion rests." Defs.' Reply 3. It is true that "[t]he nonmoving party . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). And, "[i]t is well established that '[c]onclusory and hearsay evidence does not provide support sufficient to defeat a summary judgment motion.'" *Dewitt v. Clean Harbors Envtl. Servs., Inc.*, No. RDB-16-1705, 2017 WL 3116609, at *6 (D. Md. July 21, 2017) (quoting *Mungro v. Giant Food, Inc.*, 187 F. Supp. 2d 518, 523 (D. Md. 2002)). Additionally,

> [u]nder the sham affidavit doctrine, "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."

*Zimmerman v. Novartis Pharmaceuticals Corp.*, 287 F.R.D. 357, 362 (D. Md. 2012) (quoting *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)). But, "[a]pplication of the sham affidavit rule at the summary judgment stage '*must be carefully limited to situations involving flat*

*contradictions of material fact.*'" *Id.* (quoting *Mandengue v. ADT Sec. Sys., Inc.*, No. ELH-09-3103, 2012 WL 892621, at *18 (D. Md. Mar. 14, 2012)). Also, if "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380 (2007).

Thus, Defendants are correct that Agent Hicks cannot defeat their motion using statements based on speculation or conjecture, or statements that contradict his own, earlier testimony. *See id.*; *Beale*, 769 F.2d at 214. Nonetheless, Agent Hicks certainly may testify as to his first-hand recollection of events, even if his recollection is contrary to that of all other witnesses, as it is for the finder of fact to weigh such testimony and assess the credibility of witnesses. *See Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002) (stating that court does not "weigh[] the evidence or assess[] the witnesses' credibility" in deciding a summary judgment motion).

Defendants assert that, while Agent Hicks testified that "Sgt. Wallace arrived on the scene after the motorcade left the area of the incident," Defs' Reply 3, Officer Ferreyra testified to the contrary, that Sergeant Wallace was on the scene when the motorcade passed, *id.* at 4. As Defendants acknowledge, Agent Hicks testified in his deposition that "[t]he motorcade had actually left prior to [Sergeant Wallace] getting there." Hicks Dep. 121:2–5. Whether Sergeant Wallace was present when the motorcade passed is simply a dispute of fact, and Officer Ferreyra's testimony on its own does not negate Agent Hicks's. *See Dennis*, 290 F.3d at 644–45.

Defendants insist that other evidence also places Sergeant Wallace at the scene when the motorcade passed: Sergeant Wallace and Agent Hicks both testified that Sergeant Wallace arrived while Agent Hicks was talking on his phone; Agent Hicks himself testified specifically that he was

talking to ATSAIC (Assistant to the Special Agent in Charge) Robert Keane, a call that Agent Hicks's call log showed lasted from 6:32 to 6:50 a.m.; and Agent Hicks admitted that the motorcade passed around 6:40 a.m. *See* Wallace Dep. 34:15–20; Hicks Dep. 112:4–7, 204:2–205:17; Pl.'s Opp'n 5. This undisputed evidence establishes that Sergeant Wallace arrived between 6:32 and 6:50 a.m. and the motorcade passed at 6:40 a.m. Thus, Sergeant Wallace could have arrived after 6:32 but before 6:40, such that he was present when the motorcade passed. Yet he also could have arrived after 6:40 but before 6:50 and not been present when the motorcade passed. Therefore, although Agent Hicks and Defendants "tell two different stories," Agent Hicks's story is not "blatantly contradicted by the record, so that no reasonable jury could believe it." *See Scott*, 550 U.S. at 380. Consequently, taking the facts in the light most favorable to Plaintiff for purposes of deciding Defendants' motion, the Court must adopt his version of the facts, *see id.*: Sergeant Wallace arrived while Agent Hicks was on the phone with his supervisor but after the motorcade passed. As the discussion below shows, however, which came first, the supervisor or the motorcade, is not material to the resolution of the issue before the Court—whether Defendants detained Agent Hicks during the first stop longer than necessary to ascertain whether a crime was being committed. And, Defendants have not identified any other instances where Agent Hicks's testimony purportedly contradicts his own prior testimony or is speculative, rather than simply being his own recollection of events that differs from theirs.

## Count I – *Bivens* Claim

Defendants argue that the Court should enter judgment in their favor on Hicks's *Bivens* claims because, in their view, both of their detentions of Hicks were reasonable under the circumstances and they are entitled to qualified immunity on that basis. Defs.' Mem. 2. Plaintiff does not challenge Officer Ferreyra's conduct in initiating the first stop. Pl.'s Opp'n 8. Rather,

he challenges his continued detention during that stop, after he showed his credentials, as well as when Officer Phillips stopped him within minutes of when he was free to go from the first stop. Pl.'s Opp'n 8. As I observed in the April 11, 2017 Memorandum Opinion and Order finding that Defendants had not shown, based on the record before me at that time, that they were entitled to qualified immunity:

> "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Thus, qualified immunity is available for officers or agents who "act in objectively reasonable reliance on existing law." *Queen v. Prince George's Cnty.*, 188 F. Supp. 3d 535, 541 (D. Md. 2016) (quoting *Rockwell v. Mayor & City Council of Baltimore*, No. RDB-13-3049, 2014 WL 949859, at *8 n.10 (D. Md. Mar. 11, 2014)).

> Courts apply the same analysis to determine whether qualified immunity is available to a law enforcement officer or agent under either *Bivens* or [42 U.S.C.] § 1983. *See Wilson*, 526 U.S. at 609. The analysis "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "In particular, . . . qualified immunity protects law officers from 'bad guesses in gray areas' and it ensures that they may be held personally liable only 'for transgressing bright lines.'" *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

> Pursuant to this doctrine, police officers are not liable under *Bivens* or § 1983 unless "(1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right and (2) the right was 'clearly established' such that a reasonable person would have known his acts or omissions violated that right." *Streater v. Wilson*, 565 Fed. App'x 208, 210 (4th Cir. 2014) (quoting *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011) (internal citations omitted)). The Court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in th[is] particular case at hand." *Pearson*, 555 U.S. at 236. The defendant carries the burden of proving qualified immunity. *McDonnell v. Hewitt–Angleberger*, No. WMN-11-3284, 2013 WL 4852308, at *3 (D. Md. Sept. 9, 2013) (quoting *Meyers v. Baltimore Cnty., Md.*, 713 F.3d 723, 731 (4th Cir. 2013)).

Apr. 11, 2017 Mem. Op. & Order 5–6.

The issue is whether Defendants violated Agent Hicks's clearly established Fourth Amendment rights by detaining him longer than necessary during the first stop and/or by detaining him a second time soon after that stop. Am. Compl. ¶¶ 55–59. "The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 377 (D. Md. 2018) (quoting U.S. Const. amend. IV). "'Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure"' under the Fourth Amendment. An automobile stop, therefore, is subject to the reasonableness requirement of the Fourth Amendment." *United States v. Bowman*, 884 F.3d 200, 209–10 (4th Cir. 2018) (quoting *Whren v. United States*, 517 U.S. 806, 809 (1996); citing *Whren*, 517 U.S. at 810)).

Generally, to be reasonable, a seizure must be "'based on probable cause' to believe that the individual has committed a crime." *Bailey v. United States*, 568 U.S. 186, 192 (2013) (quoting *Dunaway v. New York,* 442 U.S. 200, 213 (1979)).[5] "[S]ome latitude" exists, however, for

---

[5]     Probable cause exists if the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S. Ct. 2627, 61 L.Ed.2d 343 (1979)). Probable cause "deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S. Ct. 795, 157 L.Ed.2d 769 (2003). The United States Supreme Court has recently stressed that "[p]robable cause 'is not a high bar.'" [*District of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 586 (2018)] (quoting *Kaley v. United States*, 571 U.S. 320, 338, 134 S. Ct. 1090, 188 L.Ed.2d 46 (2014) ). "To prove an absence of probable cause, [the plaintiff] must allege a set of facts which made it unjustifiable for a reasonable officer to conclude" that the plaintiff had violated the relevant statute. *Brown v. Gilmore*, 278 F.3d 362, 368 (4th Cir. 2002).

*Stutzman v. Krenik*, 350 F. Supp. 3d 366, 377 (D. Md. 2018).

detention without probable cause "where 'the intrusion on the citizen's privacy "was so much less severe" than that involved in a traditional arrest that "the opposing interests in crime prevention and detection and in the police officer's safety" could support the seizure as reasonable.'" *Bailey*, 568 U.S. at 193 (quoting *Michigan v. Summers*, 452 U.S. 692, 697–98 (1981). This means that "a police officer whose observations lead him to suspect that a particular person has committed or is about to commit a crime [may] detain the person briefly in order to 'investigate the circumstances that provoke suspicion.'" *United States v. Johnson*, 599 F.3d 339, 345 (4th Cir. 2010) (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 881 (1975)). And, "[s]o long as a temporary detention is for this limited purpose, it does not cross the line into a full-blown arrest." *Id.* (concluding that officer's "conduct was entirely consistent with simply trying to ascertain who Johnson was and what he was doing").

These brief detentions are known as "*Terry* stops," because in *Terry v. Ohio*, 392 U.S. 1, 27 (1968), the Supreme Court held that "a police officer who has reasonable suspicion of criminal activity may conduct a brief investigative stop." *Bailey*, 568 U.S. at 193. "Reasonable suspicion is a commonsense, nontechnical standard," *Palmer*, 820 F.3d at 650, "that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," *Ornelas*, 517 U.S. at 695." *United States v. Bowman*, 884 F.3d 200, 213 (4th Cir. 2018) (internal quotation marks omitted).

> A *Terry* stop satisfies the reasonableness requirement of the Fourth Amendment if there exists "a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). This requires only "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Cortez,* 449 U.S. at 417, 101 S.Ct. 690.

*United States v. Johnson*, 599 F.3d 339, 345 (4th Cir. 2010). To determine reasonableness, the court considers "the totality of the circumstances." *United States v. Kehoe*, 893 F.3d 232, 237 (4th

Cir. 2018), *cert. denied,* 139 S. Ct. 842 (2019) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

This standard "is less demanding than the probable cause standard or even the preponderance of evidence standard." *United States v. Bowman*, 884 F.3d 200, 213 (4th Cir. 2018) (citing *Wardlow*, 528 U.S. at 123). Nonetheless, "the officer's suspicions must . . . be more than an "inchoate and unparticularized suspicion or hunch." *United States v. Johnson*, 599 F.3d 339, 345 (4th Cir. 2010) (quoting *Terry,* 392 U.S. at 27). That is, "the government agent must articulate a particularized, objective basis for his or her actions." *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018), *cert. denied,* 139 S. Ct. 842 (2019).

Notably, "a seizure that is 'lawful at its inception can nevertheless violate the Fourth Amendment because its *manner* of execution unreasonably infringes' on rights protected by the Fourth Amendment." *Bowman*, 884 F.3d at 209 (quoting *United States v. Jacobsen*, 466 U.S. 109, 124 (1984) (emphasis in *Bowman*). In *Bowman*, the defendant did "not challenge the reasonableness of the initial traffic stop" but rather questioned whether the officer's "actions during the stop . . . trench[ed] upon [his] Fourth Amendment rights when he extended an otherwise-completed traffic stop." *Id.* Agent Hicks raises the same issue regarding the first stop.

"[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Sharpe*, 470 U.S. 675, 684 (1985) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). "[I]n assessing the effect of the length of the detention, [the court] take[s] into account whether the police diligently pursue their investigation." *Sharpe*, 470 U.S. at 685 (quoting *United States v. Place*, 462 U.S. 696, 709 (1983)). Thus, although the length of the detention "is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion," *Sharpe*, 470 U.S. at 685 (quoting

*Place,* 462 U.S. at 709), the Supreme Court "ha[s] emphasize[d] the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes," *id.* (quoting *United States v. Hensley,* 469 U.S. 221, 228–29 (1985)).

"Certainly, the Fourth Amendment right to be seized only on probable cause [is] clearly established." *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 561 (4th Cir. 2017), *as amended* (Aug. 22, 2017), *cert. denied sub nom. Mayor & City Council of City of Baltimore, Maryland v. Humbert*, 138 S. Ct. 2602 (2018). Additionally, both the right not to be stopped "absent . . . reasonable suspicion" and the right not to be detained longer than necessary are clearly established. *See Artiga Carrero v. Farrelly*, 270 F. Supp. 3d 851, 872 (D. Md. 2017), *recons. denied in part sub nom. Carrero v. Farrelly*, No. JKB-16-3939, 2018 WL 1761957 (D. Md. Apr. 12, 2018). What I must consider is "whether the violative nature of *particular* conduct is clearly established." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Mullenix v. Luna,* 577 U.S. ——, ——, 136 S. Ct. 305, 308 (2015) (*per curiam*)).

<u>First Stop</u>

It is undisputed that Officer Ferreyra arrived on the scene at about 6 a.m., Officer Phillips by about 6:15 a.m., and the motorcade passed at approximately 6:40 a.m. Taking the facts in the light most favorable to Agent Hicks, he was not free to leave until between 6:40 and 6:59 a.m. because Officer Ferreyra did not return his credentials and weapon. Further, Officers Ferreyra saw Agent Hicks's credentials and verified that he was a Secret Service Agent before he called his supervisor and knew that he was an on duty Secret Service Agent at least fifteen minutes before the motorcade passed, that is, by about 6:25 a.m. Given that Sergeant Wallace arrived while Agent Hicks was on the phone with ATSAIC Keane, and the call with Keane did not begin until 6:32 a.m., Officer Ferreyra knew that Agent Hicks was an on duty Secret Service Agent at least seven

minutes before his supervisor arrived. Additionally, Agent Hicks's vehicle had strobing lights and flashers, lending more credibility to Agent Hicks's credentials (if indeed any more credibility were necessary to confirm that Hicks was a Secret Service agent). Officer Phillips became aware that Agent Hicks was an on duty Secret Service Agent as soon as he arrived, if not sooner, but also did not inform Agent Hicks that he was free to leave.

It is true that Agent Hicks's weapon on the seat of his car gave Officer Ferreyra reasonable suspicion to investigate the scene, given that Maryland law provides that "a person may not: (i) wear, carry, or transport a handgun . . . on or about the person; [or] (ii) wear, carry, or knowingly transport a handgun . . . in a vehicle traveling on a . . . highway . . . ." Md. Code Ann., Crim. Law § 4-203(a)(1). Yet, a federal "law enforcement official" is not prohibited from "wearing, carrying, or transporting . . . a handgun" if the official "is authorized at the time and under the circumstances to wear, carry, or transport the handgun as part of the person's official equipment." Crim. Law § 4-203(b)(1)(i); *see also* 18 U.S.C. § 3056(c)(1)(B) (stating that Secret Service agents "are authorized to . . . carry firearms." And, when asked in his deposition whether he had "any reason to doubt the validity of [Hicks's] credentials," Officer Ferreyra answered, "No, not really" and said that "they looked legit"; he also testified that arresting Agent Hicks "was not on [his] mind at th[e] time" he asked his supervisor to come to the scene. Ferreyra Dep. 136:2–137:8, 138:2–5. Thus, on the record before me, once Officer Ferreyra saw Agent Hicks's credentials, or at the very latest after he assuaged any concerns he had that Agent Hicks may have been a "police impersonator[]," *see id.* at 96:1–97:7, he had "effectuate[d] the purpose of the stop" and the presence of the handgun no longer provided him and Officer Phillips with a reasonable basis for detaining Agent Hicks. *See Sharpe*, 470 U.S. at 685.

To justify the continued detention, Defendants argue that "Agent Hicks' claim that he was a Secret Service agent who could provide a possibly innocent explanation for openly carrying and transporting a firearm in a vehicle is unavailing" because "they were not required – as Agent Hicks insinuates – to accept his explanation at face value." Defs.' Mem. 13. Yet, there is evidence on the record before me that both Defendants accepted that Agent Hicks was a Secret Service Agent at least fifteen minutes before the motorcade passed and at least seven minutes before their supervisor arrived, and his detention continued for about ten minutes or more after the motorcade passed. *See* Ferreyra Dep. 96:1–97:7, 136:2–137:8, 138:2–5, 146:12–147:14, 149:4–13, 312:4–18; Phillips Dep. 30:6–16, 35:4–16, 37:10–21; Lt. Wallace Dep. 19:15–21. Further, Defendants still have not shown why they could not, in less than fifteen minutes, ascertain that Secret Service agents indeed are authorized to carry and transport their weapons in their vehicles, when, as I noted in my April 11, 2017 Memorandum Opinion and Order, a simple Google search would yield such information. *See* 18 U.S.C. § 3056(c)(1)(B); Crim. Law § 4-203(b)(1)(i); https://www.secretservice.gov/about/faqs/ ("Under Title 18, Section 3056, of the United States Code, agents and officers of the United States Secret Service can . . . [c]arry firearms.").

Defendants also assert that it was "customary protocol" under those circumstances, in which "Agent Hicks disputed that he had been asleep," to summon a supervisor and not permit the detainee to leave until the supervisor appeared. Defs.' Mem. 14. Certainly, Officer Ferreyra was concerned that he had drawn his weapon on a Secret Service agent and that he and Agent Hicks disputed the circumstances of the initial encounter. *See* Ferreyra Dep. 111:4–20 (sealed). But Defendants do not point to any tangible evidence establishing that there was a protocol requiring them to continue Agent Hicks's detention (for example, a departmental regulation or standing order), other than for Officer Ferreyra's personal interest in having his supervisor present before

Agent Hicks left the scene. Indeed, Officer Ferreyra, who maintained that Agent Hicks was free

to go, himself testified that he informed Agent Hicks,

> "If you decide to leave, I already know who you are. It doesn't matter. I'm just
> doing what procedurally I'm supposed to be doing for my department."
>
> …
>
> [T]here was no specific talk, "Well you can't go anywhere until my supervisor gets
> here."
>
> That's not who I am. I had already IDed him, I already knew who he was,
> so if he decided to leave, and I explained this to him, I, I don't want to say I don't
> care, but I don't care. I'm going to write a report about it anyway. My events aren't
> going to change, so it doesn't matter.
>
> Q. I guess I'm just trying to understand clearly, did you tell him that he could leave
> and that you didn't care if he did or not?
>
> A. Yeah. I told him, "You do what you got to do. If you decide to leave, go ahead."

Ferreyra Dep. 151:5-10, 151:21 – 152:12; *see also* Ferreyra Dep. 116:14–22 (sealed) (answering

"Yes" to the question "if you have a situation where you have brandished your weapon; you do an

investigation; you've determined there's nothing to see here; you're not going to arrest this person,

can you just release that person even if there is no supervisor on the scene?").  Thus, while Officer

Ferreyra may have wanted a supervisor to assess the situation, given that he drew his weapon and

Agent Hicks disagreed about the circumstances of the initial encounter, there is no evidence that

the Park Police were following an established protocol when they continued to detain Agent Hicks

for more than fifteen minutes after they knew that he was an on duty Secret Service agent.

Therefore, Defendants have failed to "articulate a particularized, objective basis" for their

continued detention of Agent Hicks; nor have they shown that it was reasonable under the

circumstances.  *See Kehoe*, 893 F.3d at 237.

Moreover, it is clearly established that detaining a person under these circumstances—

when the officers had a reasonable suspicion that criminal activity was underway but, after some

investigation, became aware that no criminal activity was happening at the scene—is a violation

of the individual's Fourth Amendment rights. *See id.*; *Bowman*, 884 F.3d at 209; *Artiga Carrero*, 270 F. Supp. 3d at 872.  Therefore, Defendants may be liable under *Bivens* with regard to the prolonging of the first stop and are not entitled to qualified immunity. *See Streater v. Wilson*, 565 Fed. App'x 208, 210 (4th Cir. 2014); *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011).

Second Stop

The parties dispute whether Officer Phillips left the scene before or after Agent Hicks. When the record is viewed in the light most favorable to Agent Hicks, Officer Phillips left the scene after Agent Hicks and knew it was Agent Hicks's vehicle he was stopping.  Even if Officer Phillips left the scene first and initially did not recognize the vehicle, he concedes that he recognized Agent Hicks (whom he knew to be a Secret Service agent) when he walked up to Agent Hicks's window and requested his license and registration.

As for why Officer Phillips stopped Agent Hicks, Officer Phillips testified that it was because he observed a driver (i.e., Hicks) who was driving erratically and talking on a cellular phone.  But Agent Hicks stated in an affidavit that he "was not swerving in and out of [his] lane, driving recklessly, or engaging in any other manner of driving which would warrant being pulled over by the USPP."  Hicks Aff. ¶ 4, ECF No. 80-15.  Defendants have not identified any earlier testimony of Agent Hicks's to the contrary.  Agent Hicks asserts that, "[d]uring [his] deposition in this matter, [he] was not questioned regarding the manner in which [he] was driving prior to being detained for the second time . . . ."  *Id.* ¶ 3.  And, SAIC Brian Murphy's testimony, which Defendants do not challenge, corroborates Agent Hicks's statement, as SAIC Murphy testified that Agent Hicks told him about what transpired that morning but Murphy did not receive "any information to suggest he was driving the vehicle unsafely."  Murphy Dep. 73:3–10, ECF No. 80-

5.  Thus, a genuine dispute exists regarding this material fact and, in the light most favorable to Hicks, he was not driving erratically.

Certainly, Maryland law prohibits the "use of [a] handheld telephone while driving."  Md. Code Ann., Transp. § 21-1124.2.  Thus, a police officer would have a reasonable suspicion to stop a driver who was talking on a handheld phone while driving.  *See id.*  But, the statutory prohibition "does not apply to . . . [u]se of a handheld telephone by . . . [l]aw enforcement personnel" when the individual using the phone is "acting within the scope of official duty."  Md. Code Ann., Transp. § 21-1124.2(b)(2)(i).  Consequently, given that Officer Phillips knew that Agent Hicks was an on duty Secret Service Agent, he no longer had a reasonable suspicion to justify detaining Agent Hicks, once he recognized him.  *See id.*  Again, Officer Phillips has not "articulate[d] a particularized, objective basis" for continuing to detain Agent Hicks or shown that it was reasonable under the circumstances to do so.  *See Kehoe*, 893 F.3d at 237.  And again, it is clearly established that when, as here, the officer, after initially suspecting criminal activity, becomes aware that no criminal activity is happening, it is a violation of an individual's Fourth Amendment rights to continue to detain him. *See id.*; *Bowman*, 884 F.3d at 209; *Artiga Carrero*, 270 F. Supp. 3d at 872.  Therefore, Defendants may be liable under *Bivens* regarding the second stop as well and have not carried their burden of establishing that they are entitled to qualified immunity. *See Streater v. Wilson*, 565 Fed. App'x 208, 210 (4th Cir. 2014); *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011).

## Count II – Section 1985(1) Claim

Plaintiff claims that Defendants effected the two stops as part of a conspiracy to "prevent[] him from discharging duties related to his position as a federal officer," in violation of 42 U.S.C. § 1985(1).  Pursuant to the intracorporate conspiracy doctrine, a plaintiff typically cannot bring a

civil conspiracy claim, based on an agreement between "agents of the same legal entity, when the agents act in their official capacities." *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017) (holding that this type of "conspiracy" is not "unlawful"); *see also Buschi v. Kirven*, 775 F.2d 1240, 1252 (4th Cir. 1985) (noting that "the immunity granted under the doctrine to the agents and the corporation" is not "destroyed because the agents are sued individually"). This doctrine "extends to government entities." *Kangalee v. Baltimore City Police Dep't*, No. RDB-12-01566, 2012 WL 5457231, at *7 (D. Md. Nov. 7, 2012) (quoting *McHugh v. Mayor of Baltimore*, No. BPG-09-1214, 2011 WL 1135853, at *11 n.15 (D. Md. Mar. 24, 2011)); *see also Buschi*, 775 F.2d at 1251–52 (observing that the doctrine "has been applied in the civil rights area, involving 'officials of a public body who act within the scope of their employment'" (internal citations omitted)). Two exceptions exist, however:

> (1) when a corporate officer has an "independent personal stake" in achieving the illegal objectives of the corporation, *Greenville Publ'g Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974), and (2) when the agent's acts are unauthorized. *Buschi v. Kirven,* 775 F.2d 1240, 1252-53 (4th Cir. 1985).

*Bumgardner v. Taylor*, No. RDB-18-1438, 2019 WL 1411059, at *6 (D. Md. Mar. 28, 2019). Plaintiff contends that both exceptions apply here. Pl.'s Opp'n 23–24.

"For the independent personal stake exception to apply, 'a conspirator must possess a personal interest independent and "wholly separable" from the interests of the corporation.'" *Bumgardner*, 2019 WL 1411059, at *6 (quoting *Walters v. McMahen,* 795 F. Supp. 2d 350, 359 (D. Md. 2011)). Agent Hicks argues that he has identified "evidence [that] supports a finding that Defendants had independent, personal interests in the illegal activity that they undertook." Pl.'s Opp'n 23. According to Agent Hicks, when "officers . . . face[] personal investigation for their use of excessive force," they have "a personal stake in 'convinc[ing] superiors and the public that . . . [they] acted appropriately[.]'" Pl.'s Opp'n 23 (quoting *Heyward v. Tyner*, No. 17-1545-DCN,

2018 WL 1391434, at *5 (D.S.C. Mar. 20, 2018)).  And, he insists, an officer who was present but "had not engaged in excessive force also had personal incentive to 'benefit . . . . by protecting one of their fellow law enforcement officers and avoiding further scrutiny on themselves and police officers[.]." *Id.* at 24 (quoting *Heyward*, 2018 WL 1391434, at *5).

Even if Agent Hicks's argument were convincing that Officer Ferreyra had a personal interest in justifying his use of force on another officer, or his alternative argument were convincing that Officer Ferreyra had a personal interest in revenge against Agent Hicks based on a past incident, and even if Agent Hicks argued successfully that he could further either interest by detaining Agent Hicks longer, there is no evidence that Officer Phillips had any personal stake in the outcome.  In Agent Hicks's view, "Officer Phillips, for his part, was personally invested in protecting his friend of ten years, as demonstrated by Officer Phillips's attempts to get Agent Hicks to admit to Officer Ferreyra's version of events."  Pl.'s Opp'n 24.  Agent Hicks relies on Officer Ferreyra's deposition testimony.  *Id.* (citing Ferreyra Dep. 147:16-21, 154:19-155:20).  Officer Ferreyra testified as follows:

> Q. And did you know Phillips before this incident?
> A. Yes.
> Q. How long have you known him?
> A. Play it safe, a decade.  I don't know how long.
> Q. Do you have a relationship with him outside of work?
> A. *We've hung out a few times*.
> Q. Prior to this incident?
> A. Uh-huh. Yes.
> Q. You would say he was a friend?
> A. Yeah.
> . . .
> Q. Did you overhear any part of the conversation between Phillips and Hicks?

A. I heard one part of it, yeah.

A. What part did you hear?

A. Well, I heard Officer Phillips say, he said, "How did Officer Ferreyra get your gun?"

And I heard Hicks say, "I don't want to answer that," and I heard Brian or Phillips say, "Of course you don't."

And then I was like, "Hey, come on. Enough," to Brian, like, "Come on. Stop."

Q. Why did you say that?

A. Because I already knew that Hicks wasn't – what's the point of getting him now to say, "All right. I was sleeping."

Like everything that I tried to – I don't want to say cover up, but everything I tried to just dismiss, because once we realized who everyone was and once we had a general understanding that your actions caused my actions and everyone's alive and it's okay, and I even told Hicks, "You owe me a bottle of Blue Label, man, for –" you know, thank God everything went well, once I knew he was a law enforcement officer.

Ferreyra Dep. 147:16 – 148:6, 154:19 – 155:20 (emphasis added). Contrary to Plaintiff's assertion, this testimony does not show that Officer Phillips made any "attempt[] to get Agent Hicks to admit to Officer Ferreyra's version of events." *See* Pl.'s Opp'n 24. Moreover, this testimony, which I note is from Officer Ferreyra, not Officer Phillips, does not show that Officer Phillips had any investment in protecting Officer Ferreyra.

Nor do I find that Officer Phillips's presence on the scene after Officer Ferreyra's use of force imbued him with a personal interest in the outcome of the investigation. While *Heyward*, 2018 WL 1391434, also involved an alleged conspiracy between two police officers, it is factually distinct. There, plaintiff Bryant Heyward had been shot by Officer Keith Tyner, one of two defendant police officers who entered his home in response to his 911 call reporting an armed burglary in his home; the gunshot rendered him a quadriplegic. *Heyward*, 2018 WL 1391434, at *1. Heyward claimed that, after he was shot before he had the opportunity to raise his hands, the officers who were present, as well as three other defendant officers "intentionally filed and released

various false reports both internally and to the public, and purposefully made false statements regarding the events surrounding the shooting." *Id.* Invoking the intracorporate conspiracy doctrine, the defendants moved to dismiss Heyward's civil conspiracy claim. *Id.* at *5. The district court denied the motion, because "Heyward alleged sufficient facts from which the court [could] reasonably infer that the individually named . . . defendants could benefit personally from intentionally filing false reports and making false statements to the public." *Id.* It reasoned:

> From the facts in front of the court, the court finds it plausible that Tyner and Powell could have had an incentive to claim that Heyward failed to follow their orders to drop his weapon and that he charged at them with a gun pointed at them before Tyner shot him. If Tyner and Powe[ll] could convince their superiors and the public that reasonably perceived Heyward as a threat based on these actions, they could more easily argue that Tyner acted appropriately in shooting him. If Watson, Lucas, and Cannon knew that the incident did not in fact occur this way yet made the false public statements, it is reasonable to infer that they could benefit from making those false statements by protecting one of their fellow law enforcement officers and avoiding further scrutiny on themselves and police officers in the wake of the rising tensions alleged by Heyward. Additionally, filing false reports and making false public statements would clearly exceed the bounds of moving defendants' authority as officers of [the Charleston County Sherriff's Office], another reason this case falls under the doctrine's exception.

*Id.*

Here, in contrast, Officer Phillips had nothing to gain from not informing Plaintiff that he was free to go during the first stop; Officer Ferreyra's own testimony establishes that the supervisor could have investigated the incident between Phillips and Agent Hicks at a later time and it was not necessary to detain Agent Hicks for that purpose. Moreover, the use of force was by Officer Ferreyra alone, before Officer Phillips arrived. Nor did Officer Phillips have anything to gain from his detention of Agent Hicks in the second stop. Further, unlike the false reports and statements in *Heyward*, Defendants' challenged conduct was, according to Agent Hicks's pleading, within the scope of their authority. Am. Compl. ¶¶ 19, 21.

In *Bumgardner*, the Court concluded that the first exception to the intracorporate conspiracy doctrine did not apply to a § 1985(1) claim of a conspiracy between the Baltimore Police Department ("BPD") and certain officers because, "regardless of any personal motive on the part of the Defendant officers, Bumgardner fail[ed] to allege that the BPD took any actions for an independent benefit or received any benefit from the officers' actions." 2019 WL 1411059, at *6. Likewise, here, without any evidence of "an independent benefit" for Officer Phillips, the exception cannot apply. *See id.*

Alternatively, Agent Hicks relies on "evidence in the record of ongoing tensions between USPP and the Secret Service" to establish Defendants' personal interest in detaining Agent Hicks and "repeatedly question[ing] why Hicks was in 'their' district." Pl.'s Opp'n 25 (citing Ferreyra Dep. 285:16-22; Hicks Dep. 106:17-107:4 ("why are you here, this is our district, you shouldn't be here in out [sic] district"). While Officer Ferreyra did testify that the "Secret Service and Park Police have a petty beef going on for years, petty beef," Ferreyra Dep. 285:20–22, this statement is too vague to demonstrate any personal interest on the part of either Defendant specifically, Rather, it is pure speculation to conclude that either officer had a personal interest in detaining Agent Hicks based their agency's "petty beef" with Plaintiff's agency.

With regard to the second exception, as noted, Agent Hicks claims that, "at all times relevant to th[e] Complaint," Defendants were "acting under color of federal law and within the scope of [their] employment as . . . USPP officer[s]." Am. Compl. ¶¶ 19, 21. Consequently, he cannot avoid the intracorporate conspiracy doctrine by asserting now that their acts were unauthorized. See *Bumgardner*, 2019 WL 1411059, at *6 (concluding that second exception did not "bar this Court's application of the intracorporate conspiracy doctrine," considering that "Bumgardner claim[ed] that the Defendant officers were acting within their scope of

employment").  Therefore, neither exception applies and, consequently, Agent Hicks cannot prevail on his § 1985(1) claim.  *See id.*

## **ORDER**

Accordingly, it is, this 10th day of June, 2019, hereby ORDERED that Defendants' Motion for Summary Judgment, ECF No. 78, IS DENIED as to Count I and GRANTED as to Count II.  I will schedule a call to set a date for trial on Count I.

_____/S/_____
Paul W. Grimm
United States District Judge

lyb