# EXHIBIT A

1   you can hear with traffic whizzing by.
2           The second thing was, I'm trying to get control because I
3   don't know who he is at the point.  I have no idea he's a cop.
4   Once I realize he's a cop, obviously, things start to change.
5   Q    What did you talk about with him.  What did you say?
6   A    Sure.  So, I'm asking for his credentials and he says,
7   again, I said, get that fucking gun out of my face.  I said,
8   well, if you're in law enforcement, you'll know I'm in low ready
9   and the gun is cantered off of you.  It's not on you anymore.  I
10  said, can you see me, because I don't understand.  It's clearly
11  not on you anymore.  I said, give me your credentials please.
12  The moment he hands me his credentials, I re-holster my gun once
13  I verify and my gun goes away.
14  Q    At that point, did you talk to him about he was asleep?
15  A    Yeah.
16  Q    Tell the jury what happened?
17  A    I said, thank God no one got shot.  This is happening
18  really quickly and it's kind of shocking the way it went down.
19  And I'm like, nobody got shot.  Thank God.  I said, we're going
20  to have to just call supervisors, make sure, you know, that
21  everyone is on the same page, but I'm not trying to hem you up
22  in any way at all.
23  Q    Did he get on the phone at that point?
24  A    Yeah, he was already on the phone.
25  Q    He was already on the phone?

```
 1   BY MR. WHITE::
 2   Q    All right.  What does that last line mean, 502 to AOF
 3   headed your way?
 4   A    He's saying, 502 is coming from Anacostia and 413 is also
 5   heading to your location.
 6   Q    Okay.  Who is 413?
 7   A    Officer Phillips.
 8           MR. WHITE:  All right.  Go ahead.
 9        (Audio recording is played.)
10   BY MR. WHITE::
11   Q    All right.  Tell the ladies and gentlemen of the jury, what
12   does that mean?
13   A    Yeah.  So, I'm trying to use reason with him and he keeps
14   debating with me.
15   Q    About what?
16   A    About just the facts.  He's saying, none of it ever happen.
17   And I'm like, where am I going to go with this?  I don't know
18   what to do with this.  So, I said --
19   Q    What you're --
20   A    Yep, go ahead.
21   Q    So what you're expressing that point, when you say he's
22   making bigger deal out of it than it needs to be.  What does
23   that mean?
24   A    At that point, I explained to him, no one got hurt.  I'm
25   not trying to hem you up.  It happens, people fall asleep, it's
```

```
 1   not a big deal.  Once I knew it was law enforcement, it's okay.
 2   That's how I looked at it.  And then I say, I guess we're going
 3   to take it there, so.
 4   Q    What does that mean?
 5   A    Well, his -- everything I did was in response to his
 6   actions that day.  So, I'm trying to reason with him so we can
 7   both get out of there, do what we got to do.  We're both law
 8   enforcement agencies.  To me, it's not a crime.  You know what I
 9   mean, it's a mistake.  That's the way I saw it.
10   Q    Okay, but because it's law enforcement agencies and because
11   it's a gun, you need a supervisor?
12   A    Yes.
13            MS. COBB:  Objection to the leading.
14            THE COURT:  Overruled.  Let's minimize the leading
15   there on that.
16            MR. WHITE:  All right.  Go ahead, we're at 14:15 or
17   thereabouts.
18       (Audio recording is played.)
19   BY MR. WHITE::
20   Q    All right.  You know where it says at 14:15 where it says
21   615?
22   A    Can you repeat that a little slower?
23   Q    What we just heard, line 24?
24   A    If you can replay it, I can catch it hopefully.
25            MR. WHITE:  I apologize, Judge.  It's very difficult
```

1  Q    Good morning.

2  A    Good morning, ma'am.

3  Q    You talked quite a bit about the circumstances under which

4  you first approached Nathaniel Hicks' car.  Do you remember your

5  testimony about that?

6  A    Yes.

7  Q    Okay.  Just to make sure that we're on the same page, do

8  you understand that Nathaniel Hicks is not challenging in this

9  case your reasoning for approaching him in the first place?  Do

10 you understand that?

11 A    I do now.

12 Q    You now understand that this case is about what happened

13 after he gave you his credentials and identified himself as a

14 Secret Service agent, correct?

15 A    Okay, yes.

16 Q    So, I want to focus your attention on, kind of, what

17 happened after that point, okay?

18 A    Okay.

19 Q    ==You acknowledge that very early in this interaction==

20 ==Nathaniel Hicks identifies himself as a law enforcement officer,==

21 ==correct?==

22 A    ==Correct.==

23 Q    ==And you understood that?==

24 A    ==Yes, once I got the creds, yes.==

25 Q    ==Once you got the creds and you had no reason to doubt their==

1   validity, correct?

2   A       Correct.

3   Q       And in addition to knowing that Agent Hicks was a law

4   enforcement officer, you also knew within minutes of this first

5   interaction at his car that he was on duty?

6   A       No, I did not.

7   Q       So, within minutes of the interaction at his front window,

8   are you saying, you did not know that he was on duty?

9   A       Yes, that's what I'm saying.

10  Q       Do you recall being deposed in this case, having your

11  deposition taken?

12  A       Three years ago.

13  Q       Yeah, three years ago, right?

14  A       Yes.

15  Q       And your memory about what happened was better then than it

16  is now, correct?

17  A       I don't know if it's better or worse.  It's different.

18  Q       Well, with the passage of time, memory can fade, correct?

19  A       Correct.

20  Q       So, three years ago, it's fair to say that your memory is

21  probably a little bit better about what happened in 2015 than it

22  is six year later, correct?

23  A       That's fair, yes.

24  Q       Do you recall that that deposition was videotaped?

25  A       Yes.

```
 1   Q     And you carry a gun when you're on duty, is that right?
 2   A     Yes.
 3   Q     And also when you're off duty, correct?
 4   A     Most of the time, yes.
 5   Q     You're allowed to, if you want to?
 6   A     Correct.
 7   Q     And so, you were aware that Secret Service agents as
 8   federal law enforcement officers could also carry weapons
 9   whether they're on or off duty correct?
10   A     Correct.
11   Q     And once you and you said it was immediately, learned that
12   Nathaniel Hicks was a law enforcement officer, you also knew
13   that he could carry that firearm, right?
14   A     When you say, immediately learned, do you mean from my
15   testimony or from what it says here?
16   Q     Like, very soon after you approached the window and made
17   contact with Agent Hicks, he identified himself as a law
18   enforcement officer, correct?
19   A     Yeah, after I asked him to -- yes, ma'am.
20   Q     And so, once you were satisfied you had his credentials
21   that he was a law enforcement officer, you knew he was permitted
22   to have that handgun, correct?
23   A     Correct, yes.  If he's in good status, of course, yes.
24   Q     Well, you don't have any reason to think he was not in good
25   status?
```

```
1    A     No, ma'am, I did not.
2    Q     And you've been a Park Police officer since 2005, is that
3    correct?
4    A     Yes, January 2nd.
5    Q     And as a police officer, you've received training on your
6    obligations under the Fourth Amendment, is that correct?
7    A     Yes.
8    Q     You understand that you have to comply with the Fourth
9    Amendment, right?
10   A     Yes.
11   Q     And you know that you can't detain people in violation of
12   the Fourth Amendment, right?
13   A     Correct.
14   Q     Now, you talked about, I believe you called it, a guideline
15   or policy, and I just want to make sure that we're on the same
16   page.
17         So, it's your testimony that where there's a disagreement
18   between parties and a Code 60, there's a practice and guideline
19   to call a supervisor to come to the scene so the supervisory can
20   work it out, correct?
21   A     Correct.
22   Q     You're familiar with the U.S. Park Police General Orders,
23   correct?
24   A     Yes.
25   Q     And for people who may not know, General Orders are written
```

```
1    Q    In this case, you're saying the reason that you called the
2    supervisor to the scene is because you and Agent Hicks had a
3    disagreement, correct?
4    A    Yes.
5    Q    And the disagreement, to be clear is, you had accused him
6    of sleeping and he didn't agree with that, correct?
7    A    I saw him sleeping and he didn't agree, correct.
8    Q    You accused him of something and he denied it, correct?
9    A    Correct.
10   Q    And as you said, this was not a criminal incident, right?
11   A    No, once I knew he was law enforcement, no.
12   Q    So, it's your testimony that the United States Park Police
13   has a practice that when a police officer like yourself accuses
14   a citizen of something that's non-criminal and the citizen
15   denies or challenges that accusation, they can be detained?
16   A    You can't use that and say, citizen, because if it was a
17   citizen with a gun, it would be a completely different story.
18   Q    Follow me.
19   A    I did.
20   Q    Okay.  I said, you're saying a Park Police policy is that
21   when you have a non-criminal situation, so we're not talking
22   about a gun, okay.  We're talking about a non-criminal situation
23   as you indicated this was once you found out Agent Hicks was a
24   law enforcement officer, right?
25   A    So, we're talking about non-criminal now, just the contact.
```

```
 1  not happen.
 2  Q    At the time you called your supervisor, Agent Hicks was not
 3  free to leave?
 4  A    When I called my supervisor?
 5  Q    Yes, when you called dispatch, Agent Hicks was not free to
 6  leave at that time?
 7  A    Once supervisors are called, everything stays in place.  I
 8  remove myself from the scene and we wait for supervisors.
 9  Q    So, I just want to be clear.  You called your supervisor
10  because of the disagreement, correct?
11  A    Correct.
12  Q    Once you called your supervisor, Agent Hicks was not free
13  to leave, correct?
14  A    Correct.
15  Q    Someone who is not free to leave is detained, correct?
16  A    Correct.
17  Q    Now, you just testified that you called your supervisor
18  because Agent Hicks said he was calling his supervisor, right?
19  A    Yeah, the supervisor had been called.  That's just the way
20  it played out.
21  Q    But this is not just a situation of, kind of, two people
22  having a disagreement and calling a supervisor.  That's not what
23  this is, correct?
24  A    Correct.  It's totality of everything that had taken place.
25  It wasn't just about a disagreement.
```

| | | |
|---|---|---|
| 1 | Q | And that was the order that the officers came to the scene? |
| 2 | A | That I recall, yes. |
| 3 | Q | I believe you also indicated that Agent Hicks' supervisor |
| 4 | | was going to come to the scene.  Did you testify to that? |
| 5 | A | I'm uncertain. |
| 6 | Q | Agent Hicks never told you that his supervisor was coming |
| 7 | | to the scene, correct? |
| 8 | A | I can't recall. |
| 9 | Q | His supervisor never came to the scene, correct? |
| 10 | A | Correct. |
| 11 | Q | Okay.  Is it fair to say that after you verified |
| 12 | | Agent Hicks was a law enforcement officer and had committed no |
| 13 | | crime that you were, at that point, interested in, kind of, |
| 14 | | protecting yourself and the department, right? |
| 15 | A | The terminology, committed no crime?  The gun on the seat |
| 16 | | in and of itself is not proper handling of a firearm.  So, can |
| 17 | | we just rephrase it so I can answer it, because I don't want to |
| 18 | | give these long explanations. |
| 19 | Q | No, I don't want to rephrase it, because I thought earlier |
| 20 | | you said on your direct that no crime was committed.  Are you |
| 21 | | saying you suspected Agent Hicks of criminal activity after you |
| 22 | | found out he was law enforcement officer? |
| 23 | A | There you go, no criminal activity. |
| 24 | Q | So, the question was at the point in which you were able to |
| 25 | | identify Agent Hicks as a law enforcement officer, at that point |

1    Q    Okay.  I showed you an exhibit that was a police report you
2    wrote the date of the incident, is that correct?
3    A    Yes.
4    Q    After Agent Hicks was finally released from the scene, at
5    some point you went back to your office to do a report, correct?
6    A    Yes.
7    Q    And the first report you did was just a very, kind of,
8    bare-bones report indicating that you had done a welfare check
9    on a driver, correct?
10   A    Yeah, that's a supplemental so that his information being
11   law enforcement isn't in our -- I think at the time, it went to
12   an IMAR system, so it's kind of new.  So they just wanted to,
13   because he was law enforcement, just put a brief summary and
14   then we'll do a supplemental after.
15   Q    And you really wanted to do the supplemental to, kind of,
16   lay everything out, correct?
17   A    Yeah, I had to do a supplemental, yes.
18   Q    You wanted to, correct?
19   A    Yes.
20        MS. COBB:  Can I have Court's brief indulgence?  Just
21   brief indulgence.
22        THE COURT:  Sure.
23   BY MS. COBB:
24   Q    Officer Ferreyra, just to be completely clear, when you
25   initially made your radio call to dispatch to request backup,

```
 1   you were not considering arresting Agent Hicks for anything at
 2   that point, correct?
 3   A    I never requested backup and, no, I wasn't going to arrest
 4   him.
 5   Q    When you requested your supervisor?
 6   A    Yes.
 7   Q    You weren't considering arresting Agent Hicks for anything?
 8   A    No.
 9   Q    And at that time that you requested your supervisor, you
10   also were not doing any investigation to determine whether an
11   arrest would be necessary, correct?
12   A    Correct.
13            MS. COBB:  No further questions.
14            THE COURT:  Redirect.
15            MR. WHITE:  Just briefly, Judge.
16            THE COURT:  Sure.
17                      REDIRECT EXAMINATION
18   BY MR. WHITE:
19   Q    Officer Ferreyra, I want you to take a look at Exhibit 9
20   for identification only that Ms. Cobb just showed you.
21   A    Okay.
22   Q    And here is a large, sort of, discussion about you wrote
23   something -- you wrote Exhibit 9 about the supervisor?
24   A    Can you repeat?  I'm sorry.
25   Q    Do you have it in front of you, sir?
```