# EXHIBIT C

1    windows were up?

2    A    Yes.

3    Q    How did you get the credentials to Officer Ferreyra?

4    A    At that time, when I was initially speaking with Officer

5    Ferreyra and showed him my commission book, he asked me to lower

6    the window to pass the credentials over to him.

7    Q    At the time that you're passing the credentials over to

8    Officer Ferreyra and he's taking them from you, where is his

9    gun?

10   A    His gun is still drawn and pointed in my direction.

11   Q    So now Officer Ferreyra has your credentials.  Does he take

12   anything else from you?

13   A    Yes, he takes my license and registration.

14   Q    How does he get that from you?

15   A    I hand it over to him.

16   Q    Is there anything else Officer Ferreyra takes from the car,

17   other than your credentials and license and registration?

18   A    No.

19   Q    And where is your service weapon at this point?

20   A    It's on the front seat.

21   Q    Did your service weapon remain in the front seat during

22   this encounter?

23   A    It stayed until he retrieved them.

24   Q    At what point did he take your weapon?

25   A    After he initially received my credentials, he at that

66

1    point told me not to touch the weapon.  He removed the weapon

2    and then he asked me to slowly pass over my license and

3    registration.

4    Q    What did he do with your weapon after he removed it from

5    the car?

6    A    He kept it on his person or he retrieved it for himself.

7    Q    And where was his gun at that point in time?

8    A    Still pointed in my direction.

9    Q    At this point, you said you were a law enforcement officer

10   for a long time.  Had you ever had a gun pointed on you before?

11   A    Never.

12   Q    Can you describe Officer Ferreyra's demeanor after you gave

13   him your credentials while the gun is still pointed at you?

14   A    Yes.  Officer Ferreyra's demeanor at that time was very

15   rigid.  He was very agitated to the point of seeming very angry

16   to the point where he was spitting at the mouth while he was

17   shaking profusely with the handgun pointed in by direction.

18   Q    Were you afraid?

19   A    Absolutely.

20   Q    Why?

21   A    At that particular point, as I indicated, I'd never had a

22   gun pointed at me before in that manner or for any manner for

23   that's what it's worth.  I was terrified of, possibly, being

24   shot at that time because of the nature of how he seemed to be

25   as far as agitated and upset with the gun shaking profusely,

1    which normally happens with some form of accidental fire.

2    Q    Did Officer Ferreyra ever accuse you of being asleep on the

3    scene?

4    A    Yes, he did.

5    Q    What did you say?

6    A    I indicated I was not.

7    Q    Did you ever explain to him why you were there?

8    A    Yes, I did.

9    Q    What did you tell him?

10   A    I indicated to him that I was there awaiting motorcade from

11   Department of Homeland Security for Secretary Jeh Johnson.

12   Q    Did you tell him this before or after he took the

13   credentials from you?

14   A    It was after.

15   Q    What, if anything, did Officer Ferreyra tell you after he

16   had your credentials and after you told him you were for a

17   motorcade?

18   A    He indicated that that was going to be one motorcade that I

19   was not going to be participating in.

20   Q    Did he say anything else to you?

21   A    He also indicated to shut the F up.  I'm not a f'g rooky.

22   I've been doing this for 11 years.

23   Q    Okay.  You're abbreviating, which is fine for court.  At

24   the time, did he use the full word that begins with an F?

25              THE COURT:  Look, this is a court, this is life.  You

1    testify as to what he said.

2    BY MS. COBB:

3    Q    Okay.

4    A    At that particular point, he said, "Shut the fuck up.  I'm

5    not a rooky.  I've been fucking doing this for 11 years."

6    Q    Okay.  Did Officer Ferreyra give you any instructions

7    before he left the car?

8    A    He did.  He indicated for me to sit still, do not move

9    before he returned back to his vehicle.

10   Q    Okay.  Did you sit still and not move?

11   A    Absolutely, I sure did.

12   Q    In this initial interaction with Officer Ferreyra, did you

13   ever ask to speak to his supervisor?

14   A    No, I did not.

15   Q    So now, Officer Ferreyra has walked away with your

16   credentials and your gun and your license and your registration.

17   What happens next?

18   A    At that particular point, I contacted Scott Bradley.

19   Q    Okay.  On your work or personal cell?

20   A    On my personal.

21   Q    So, I'm going to go back --

22   A    I'm sorry, on my work cellphone.

23   Q    I'm going go back to Plaintiff's Exhibit 38 and zoom in a

24   little bit so we can all see what's going on here.

25        Okay.  So we talked about the 5:47 a.m. call to Scott

1    Bradley and the 5:51 call to Scott Bradley.  What is the call

2    that you made to Scott Bradley after Officer Ferreyra walked

3    away from your car?

4    A    It would be at 6:12.

5    Q    Okay.  So, the 6:12 one right here?

6    A    Yes.

7    Q    Why did you contact Scott Bradley?

8    A    To inform him what was going on, that I was being detained

9    at that time.

10   Q    So, the call prior to Scott Bradley was at 5:51, correct?

11   A    Yes.

12   Q    And how long was that call?

13   A    One minute.

14   Q    And then the next call to Scott Bradley was at 6:12?

15   A    That's correct.

16   Q    And that was after Officer Ferreyra had already left?

17   A    Yes.

18   Q    Do you know the exact time between that 5:51 call and the

19   6:12 call that Officer Ferreyra approached your car?

20   A    I don't know the exact time, no.

21   Q    Some time in that time frame?

22   A    Yes.

23   Q    So, Officer Ferreyra has walked way.  You're on the phone

24   with Scott Bradley.  Did you ever see Officer Ferreyra again?

25   A    Yes.

1    Q    Where?

2    A    When he returned to my vehicle.

3    Q    What if anything did he say to you at that point?

4    A    At that time, when he returned to my vehicle, he indicated

5    that I wasn't going anywhere until the sergeant arrived.

6    Q    Were there any other officers that came to the scene after

7    that?

8    A    Yes.

9    Q    Who?

10   A    Officer Phillips.

11   Q    Do you see Officer Phillips in the courtroom?

12   A    Yes, I do.

13   Q    Can you point him out please?

14   A    Sitting at the rear, back of the table here.

15           THE COURT:  For the record, identifying Officer

16   Phillips.

17   BY MS. COBB:

18   Q    And when Officer Phillips came to the scene, were you able

19   to see what he was wearing?

20   A    I did.

21   Q    What was he wearing?

22   A    A uniform.

23   Q    Did he have a gun?

24   A    Yes, he had a gun.

25   Q    Did Officer Phillips ever say anything to you?

1  A    He began to interrogate me as to why I was there in their

2  Park Police district.

3  Q    Can you, kind of, give his exact -- as close as you, give

4  his exact --

5  A    Okay.  Basically, as he arrived there, he was very

6  belligerent and upset at that point as well.  He initially said

7  to me, why are you here in our district?  This is the Park

8  Police district.

9  Q    Did he ever give you, and when I say he, I'm talking about

10  Officer Phillips, ever give you any instructions?

11  A    Yes, he told me to sit and don't move.

12  Q    Did you sit and not move.

13  A    I did not move.

14  Q    At any point during this encounter, did you ask to get out

15  your car?

16  A    I asked initially, can I get out the car, yes.

17  Q    Who did you ask?

18  A    Officer Ferreyra.

19  Q    When you say initially, when?

20  A    Initially in the beginning when this started with the first

21  encounter.

22  Q    What if anything did he say to you?

23  A    No, sit still and look forward.

24  Q    Okay.  I want to go back to Plaintiff's Exhibit 38, which

25  are your work cellphone records.

1      So, we talked about the 6:12 call that you made to

2   Scott Bradley and there appear to be two other calls to

3   Scott Bradley at 6:22 and 6:23.  Do you remember making

4   additional contact with Scott Bradley?

5   A    Yes.

6   Q    Why were there multiple calls?

7   A    The initial call, I would think, at 6:22 is me trying to

8   get ahold of him with negative results.  Therefore, I called

9   back at 6:23.

10  Q    And you were on the phone with him at 6:12?

11  A    Yes.

12  Q    What happened?  Why did you disconnect from that call?

13  A    Well, he was in the process of speaking with me and I

14  indicated to him to give by call -- my supervisor rather,

15  Robert Keane a call to let him know what transpired and for him

16  to give me a call.

17  Q    At any point during the 6:22 or 6:23 call -- I guess it

18  would 6:23 since you just said you didn't reach him at 6:22, but

19  at any point during those calls were Officer Ferreyra and

20  Officer Phillips at your window and in your vicinity?

21  A    Yes, they both were.

22  Q    Agent Hicks, the next incoming call after you talked to

23  Scott Bradley is at 6:28 from an Aaron Simon.  Did you speak to

24  Aaron Simon on the scene?

25  A    No, I didn't.  I wasn't able to answer the call.

1    Q    And the next call is 6:32 a.m.  It's an incoming call and

2    who is that call from?

3    A    My supervisor, Robert Keane.

4    Q    And how long was that call?

5    A    The call was for 18 minutes.

6    Q    Were Officers Ferreyra and Phillips at your car at any

7    point while you were on the phone with your supervisor,

8    Robert Keane?

9    A    Yes, they were.

10   Q    Did you tell either of these defendants you were talking to

11   your supervisor at this time?

12   A    Yes, I implied to both of them that I was talking to my

13   supervisor at that time and he could hear what's being said.

14   Q    Okay.  You said you implied.  Did you tell them?

15   A    I'm sorry, I actually told them.

16   Q    And what if any response did you get?

17   A    At that particular point, Officer Phillips says that he

18   doesn't care who I'm talking to, to press the record button for

19   all he cares.

20   Q    I want to go back to Plaintiff Exhibit 13, which are your

21   personal cellphone records that are admitted.

22        So, Agent Hicks, I want to direct your attention -- there

23   are a number of calls between 6:30 and 6:50 a.m. on your

24   personal cellphone records.  Do you see that?

25   A    I do.

1    discontinued from the scene.

2    Q    At some point, were you released from the scene?

3    A    Yes.

4    Q    Who told you that you could leave?

5    A    Sergeant Wallace.

6    Q    Did Sergeant Wallace tell you that you could leave before

7    or after you got off the phone with Agent Keane?

8    A    It was after.

9    Q    I took this off prematurely.  Let's put Plaintiff Exhibit

10    38 back on.

11        So, I'm not trying to give you a math test, but you said

12    you talked to Robert Keane at 6:32.  The call was 18 minutes.

13    So what time did you get off the phone with Agent Keane?

14    A    That would have been 6:50.

15    Q    Okay.  So, it would be fair to say that Sergeant Wallace

16    told you you could leave sometime after 6:50 a.m.?

17    A    Yes.

18    Q    Did you have your property at the time that Sergeant

19    Wallace told you that you could leave?

20    A    No, I did not.

21    Q    Were you able to leave the scene without your property.

22    A    No, I was not.

23    Q    And, specifically, when I say property, I'm referring to

24    your gun and your credentials.  Why couldn't you leave without

25    your property?

1    A    Number one, I felt that I was still being detained at that

2    time.   And number two, they still had my credentials as well as

3    my weapon.   And of course, there was no way that I could depart

4    or leave at that time without either two -- of the two.

5    Q    Did you eventually get your property back?

6    A    I did.

7    Q    How did you get your property back?

8    A    It was placed back on my front passenger side seat.

9    Q    And it was placed back on your front passenger seat by who?

10   A    By Officer Ferreyra.

11   Q    What, if anything, does Officer Ferreyra do after he put

12   your property back?

13   A    Took a couple photos of the positioning of the materials.

14   Q    Were the materials positioned in the exact way that they

15   were when he approached your car?

16   A    No, they weren't.

17   Q    And did he explain to you why he was taking photographs at

18   that point?

19   A    No, he did not.

20   Q    Now that you have your property, do you leave?

21   A    Yes, I do.

22   Q    And when you are leaving, are you able to note the number

23   of Park Police cars that are on the scene at this time?

24   A    I vaguely remember that it was in the amount of three

25   vehicles that were still behind me.

1    Q    Do you know whose cars they were?

2    A    No, I do not.

3    Q    So you don't know which officers were still on the scene?

4    A    No, I did not.

5    Q    Earlier you testified that before you were released, your

6    supervisor gave you instructions to call him.  Now that you're

7    leaving the scene, do you call your supervisor?

8    A    I was in the process of calling my supervisor.

9    Q    What do you mean, you were in the process?

10   A    I would have to submit a combination into my phone to be

11   able to open the phone to make the call.

12   Q    Okay.  As you're trying to reach your supervisor,

13   Robert Keane, what happens next?

14   A    At that particular point, I'm being pulled over, lights and

15   sirens, again by law enforcement, which appears to be Park

16   Police.

17   Q    Okay.  What do you do as you notice you're being pulled

18   over?

19   A    I immediately called my co-worker, Mike Ratay, on my

20   personal cell.

21   Q    So, I'm going to go back your personal cell records, which

22   is Plaintiff's Exhibit 13.

23       So, you indicated you were released from the scene some

24   time after 6:50.  Are you able to identify the call that you

25   made to your co-worker, Agent Ratay, as you're being pulled

1    over?

2    A    Yes.  It would have been the 6:59.

3    Q    So, you notice lights and sirens.  You call your co-worker.

4    Do you pull over?

5    A    I do.

6    Q    After you pull over, what happens next?

7    A    I was waiting for the officer to walk up to the window at

8    which time I noticed it was Officer Phillips.  I inquired to

9    Officer Phillips why I was being pulled over for the second

10   time.  They just had me roughly over an hour ago.  He indicated

11   to me that he noticed when I left the scene that I was on the

12   cellphone and it was against the law in the state of Maryland to

13   be driving while talking on a cellphone.

14   Q    Is it against the law in Maryland for law enforcement

15   officers to use their phone while driving?

16   A    No, it is not.

17   Q    What, if anything else did Officer Phillips tell you at

18   that point?

19   A    Well, I indicated to him that I was trying to make a call

20   to my supervisor, which I had been instructed to do once I was

21   free to go.  He indicated to me at that time that I was mouthing

22   off again and requested for me to hand over my license and

23   registration.

24   Q    Did you give him your license and registration?

25   A    Yes, I did.

1    Q    And had you been driving erratically or doing anything else

2    that warranted being pulled over?

3    A    No, I had not.

4    Q    What was Officer Phillips tone when he told you, you're

5    mouthing off again?

6    A    Very aggressive, agitated again.

7    Q    What was your tone in response?

8    A    Throughout the entire event, I was totally calm.  I could

9    see exactly what was transpiring as far as officers being angry

10   for whatever reason.  So during the whole process, my attitude

11   was very calm and my demeanor was relaxed.

12   Q    Why were you remaining calm and relaxed in these

13   circumstances?

14   A    Because of fear of what could possibly happen.  Initially,

15   from the first part, I just felt at that particular point, as

16   much as they began to be agitated and aggressive, I figured

17   that, of course, I would remain calm and try diffuse the

18   situation to make a little lighter out of it before it got out

19   of hand.

20   Q    And apologies if you said this.  Did you give Officer

21   Phillips your license and registration?

22   A    Yes, I did.

23   Q    And what happens?  Did he take them from you?

24   A    He did and he proceeded back to his vehicle.

25   Q    Were you able to see him as he walked back toward his car?

1    A    Vaguely, I could see him from my rear view mirror, yes.

2    Q    What, if anything, did you see him do?

3    A    At that particular point, when he was heading back to his

4    vehicle, I noticed another cruiser had pulled over at the time

5    and an officer had exited and pulled Officer Phillips to the

6    side and they began to converse for a few minutes.

7    Q    You said cruiser.  What's a cruiser?

8    A    A vehicle, police car.

9    Q    What agency was that car from?

10   A    It was Park Police.

11   Q    Did you recognize the officer that pulled Officer Phillips

12   to the side?

13   A    No, I could not.

14   Q    Did you overhear any part of their conversation?

15   A    No, I could not.

16   Q    What happened after Officer Phillips was pulled aside by

17   this other police officer?

18   A    After conversing with that officer for a few minutes, he

19   returned to passenger front side of my vehicle.  He tossed the

20   items back on to my front seat and indicated that he wasn't

21   going to get a ticket that day, that he wasn't going to put up

22   with my nonsense, that he would leave it up to my agency to deal

23   with.

24   Q    I want to go once again to your personal cellphone records,

25   Plaintiff's Exhibit 13.  And one thing to ask, when you're on

1    Agent Keane at 7:07 a.m.?

2    A    To inform him of the status of what just took place for a

3    second time and to let him know that I had been released from

4    the first initial stop.

5    Q    During this call, did Agent Keane give you any

6    instructions?

7    A    Yes, I did.  He indicated to me to keep a mental note of

8    what transpired and what took place.

9    Q    Did you try to catch up with the motorcade at 7:07 a.m.?

10   A    No, I did not.

11   Q    Why didn't you try to catch up with the motorcade at

12   7:07 a.m.

13   A    Because of the time that had been elapsed, it was next to

14   impossible for me to catch up to the motorcade at that

15   particular time.

16   Q    Did anyone ever instruct you to try to catch up with the

17   motorcade?

18   A    No, they did not.

19   Q    Were you able to complete any part of your work assignment

20   on July 11, 2015.

21   A    No, I was not.

22   Q    In your 20 year career as a Secret Service agent, has there

23   ever been another time when you haven't been able to complete

24   your work assignments?

25   A    No, there has not been.

1    Q    So, Agent Hicks, you've talked a lot about what happened to

2    you.  I now want to shift to you explaining to the jury how this

3    affected you.

4         Can you just describe how you felt when Officer Ferreyra

5    had his gun pointed at you after you gave him your credentials?

6    A    I felt terrified at that particular point.  Realizing after

7    my credentials had been received and pretty much identifying who

8    I was, to see the state of mind that Officer Ferreyra was in,

9    which appeared to be very agitated, very upset for whatever

10   reason, to the point of verbally, aggressively assaulting me, as

11   well as spitting from the mouth and aggressively holding his

12   handgun which was shaking at the time.  I felt at that

13   particular point that I had to actually brace myself.  Once I

14   looked towards, I had to look away and indicate to myself, he's

15   going to shoot me, he's going to shoot me.

16   Q    Did that terrified feeling remain with you even after

17   Officer Ferreyra walked away from your car?

18   A    Yes, it did.

19   Q    You also talked about cursing and the manner in which the

20   defendant spoke to you.  Can you just explain a little bit more

21   how that made you feel?

22   A    It made me feel very belittled, that I was basically

23   beneath him.  First I thought that no individual or human should

24   be subjected to that type of verbal assault for no particular

25   reason, but I just felt very disgusted at the time and just very

NATHANIEL HICKS - DIRECT EXAMINATION

1  upset and scared.

2  Q    Can you describe how you felt when your co-workers passed

3  by in the motorcade and saw you held on the side of the road?

4  A    Yes.  Once I saw the motorcade pass by me on the left-hand

5  side thinking that, possibly, I would have been able to be

6  released and join them to lead them through the district as so I

7  was expected to do, once I noticed the motorcade had continued

8  on without me, it left me in a state of feeling alone.  I felt

9  completely helpless that here I was, an African-American male

10  that was surrounded by all Caucasian officers within the Park

11  Police, as well as my Secret Service counterparts being

12  Caucasian as well, I just felt that I was alone and that I was

13  there to fend for myself without knowing exactly, you know, what

14  was going to be the result of.

15  Q    Have you ever cried about what happened?

16  A    Yes, I have.

17  Q    Are you someone who cries often?

18  A    No, I'm not.

19  Q    Can you explain that a little bit?

20  A    I like to pride myself as an emotionally strong individual

21  and I can recall vividly, basically, that I cried twice in my

22  lifetime as an adult.  And those times being when my

23  grandmother, as well as my father passed away.

24        So, for me to have cried about this particular incident to

25  the point of me getting that emotional had to be pretty

1    significant and a tragedy that happened in my life.

2    Q      Did being detained by these defendants have any impact on

3    you after July 11, 2015?

4    A      Yes, I did.

5    Q      Does it still affect you?

6    A      It sure does.

7    Q      Let's start to talk about how, if it did, impact your work.

8    Did this incident affect at all how you relate to people around

9    you at work at the time and continuing?

10   A      Because of this incident, when I returned to work, I felt

11   ostracized from my co-workers and friends.   I felt withdrawn

12   from speaking with them in fear of thinking, what was their

13   actual thinking or could there have been something that I could

14   have done to prevent this; was I less than them for actually

15   having such an event occurred.   I just felt completely

16   ostracized and to myself at work, and it was hard to communicate

17   with my co-workers.

18   Q      And how about personally?   Has this impacted any

19   conversations or interactions you've had with your children?

20   A      I really -- that particular situation with my family,

21   including my wife and my kids, became a very big issue to me.

22   Realizing that at that particular point, that while I was there

23   on the scene, I did everything that was asked of me.   I

24   cooperated fully with the officers.   I gave them exactly what

25   they wanted.   I kept a cool and clear demeanor, a calm demeanor

1   throughout the entire process.  But it seemed at that time, no

2   matter what I did there was still going to be the same and it

3   was not going to make a difference.

4         I also think about the time that after going through

5   something like this, my son was in college at that time and

6   actually speaking to him as well as my daughter about incidents

7   like that that had it been them, you know, that wasn't trained

8   as I was to de-escalate situation that you could see that could

9   possibly go wrong, to not possibly speak in a calm manner or

10  demeanor at that particular point, or my God, just thinking, if

11  they had made such a wrong movement at any time not realizing

12  what they were doing, the actual cause or effects that could

13  have happened, when I think about it as far as my kids or even

14  my wife, or the general public for that matter, being in that

15  position, not realizing what was going and not -- how to act or

16  to act, the actual tragedy that could have became of that.

17        This is something that I struggle with on a regular basis.

18  It puts me in a frame of mind that regardless of counseling,

19  training or any other type of intervention, this is something

20  that scarred me deeply within.  This is something that you can't

21  relatively lose sight of or forget because I feel as though

22  emotionally I'm wounded inside that cannot be properly healed.

23  Q     Did you seek any help or talk to anyone about your

24  feelings?

25  A     Yes, I did.

1    Q     What kind of help did you seek?

2    A     I seek psychological counseling.

3    Q     And why did you seek psychological counseling?

4    A     As I indicated, there was a very troubling time for me at

5    that time, which I still deal with in that manner.  It began by

6    me acting totally completely different towards my family, my

7    wife and kids, becoming very distant, very short patient to the

8    point where my wife and I really felt that it was affecting us

9    as a family.  We discussed it and we decided or thought rather,

10   that it would be in my best interest, you know, frame of mind to

11   actually seek more professional help to try to deal with what I

12   was going through.

13   Q     And you said you perceived being short with your family.

14   Were you still respectful to them and treated them well?

15   A     I was, but there was significantly a difference.  They may

16   have not known what I was going through directly internally

17   themselves, because, of course, it was hard for me to actually

18   describe the feeling; that no one would actually know rather

19   than being to yourself how you felt internally.  But I always

20   tried to keep it to a point as I always with my family to be

21   respective, of course, and treat them with dignity.  But at that

22   point, a lot of times during that particular time frame, I did

23   find myself being distant from them and being rude and short

24   patient.  And just overall, it, it just sums up to the fact of

25   me consistently thinking, my God, if it was one of my kids, as I

1   indicated before or the general public that was put in that

2   position, if it didn't work for me for doing the right thing as

3   far as, once again, staying calm and my demeanor being totally

4   relaxed to fully cooperating with the officers as to what they

5   wanted that particular time, to anyone who hasn't been trained

6   to that particular situation to know how to conduct themselves,

7   the actual possible tragedy that could occur as a result of it.

8        And to think that it could be one of by kids or my wife is

9   totally overwhelming to me.  It's something that's ir-rehensible

10  [sic] to the point of thinking, first of all, it was something

11  that should have never materialized to that extent.  But my God,

12  what would happened if it was my kids or my family, or even the

13  general public.

14  Q    Had you ever sought therapy before?

15  A    No, I haven't.

16  Q    And how many times did you talk to someone professionally

17  about this?

18  A    At least twice in person.

19  Q    Why didn't you continue to seek professional therapy?

20  A    Because as I indicated, I felt like it was beyond what I

21  could control or beyond what I could help feel that I was

22  solving or what the matter had taken place.  I just felt like I

23  had to overall -- I needed more professional experience.

24  Q    And why didn't you continue to go to professional sessions?

25  A    At the time that I initially saw my counselor for the first

1    couple of times, I was immediately placed on a protection for

2    the campaign.  At that particular time, the campaign consisted

3    of me traveling for weeks at a time.  Therefore, it would have

4    been next to impossible for me to see and be treated by this

5    counselor in person.

6    Q    Has this affected your sleep?

7    A    Yes, it has.

8    Q    How?

9    A    Still to this day, I wake up various times of night

10   reliving the horrific details of what took place with me that

11   day to the point of just thinking, once again, you know, why did

12   this happen.  You know, did I have any bearing in causing this,

13   which I hadn't, I hadn't done anything wrong.

14        It also brings me to the point of seeing through the media,

15   seeing on television, you know, of the misconduct of other

16   officers that's being displayed towards the public as well as

17   other individuals.

18        It opens up a wound that is already there, but it also

19   opens a wound to the point of me reliving this horrible

20   experience from the beginning and to see it vividly as to how it

21   took place that day.

22   Q    How often do you think about what happened to you?

23   A    Very often, as I indicated, I casually or often think about

24   rather myself with no apparent reason.  But as I indicated, once

25   I hear or see through the media, the news, it elevates it to the

1    point of reliving the entire incident all over again.

2          MS. COBB:  Thank you.  I don't have any further

3    questions.

4          THE COURT:  Should we take a quick break.  It's about

5    11:00.  I think if we take a 15-minute break, we can come back

6    at five minutes after, it would give you all a moment to look at

7    your notes and we can begin cross at that time.

8          Mr. Hicks, please don't discuss your testimony during

9    the break that you have already talked about, because you have

10   not yet been tendered for cross-examination.

11         Take a 15-minute break, be back here no later -- this

12   is a real 15-minute break, no later than five minutes after

13   11:00.

14         Thank you.  We're in recess for 15 minutes.

15      (Jury out.)

16         THE COURT:  All right.  Take a quick break.  I'm going

17   to come in and see if we can't get the issue with regard to the

18   lieutenant that you raised this morning and see if we can't do

19   that before they come out.  So, take a break now and then come

20   back, and we'll still do it within that time.

21         MR. PARENT:  Thank you, Judge.

22      (Brief recess.)

23         THE COURT:  Counsel, can we address real quick -- I

24   want to talk about the issue associated with the Lieutenant

25   Wallace.  So, this is a document that was filed on July 5th,