**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| NATHANIEL HICKS, | | |
| | * | |
| Plaintiff, | | |
| | * | |
| v. | | Case No.: PWG-16-2521 |
| | * | |
| OFFICER GERALD L. FERREYRA, *et al.*, | | |
| | * | |
| Defendants. | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

This is a civil case involving a claim, referred to as a *Bivens*[1] claim, under which the Plaintiff, United States Secret Service Special Agent (now retired) Nathaniel Hicks, alleged a violation of his constitutional rights that took place on July 15, 2015 by Defendants, United States Park Police Officers Gerald Ferreyra and Brian Phillips.  This case was tried before a jury on July 6-9, 2021, and a jury verdict was rendered in favor of Agent Hicks with an award of compensatory and punitive damages.  Now pending before me is Defendants' motion for judgment as a matter of law nothwithstanding the jury's verdict, or for a new trial.  Mot., ECF No. 165.  I have reviewed all the filings[2] and find a hearing unnecessary.  *See* Loc. R. 105.6 (D. Md. 2021).  For the reasons stated below, Defendants' motion is DENIED.

---

[1]     Referring to *Bivens v. Six Unknown Named Agents of Fed. Bur. Of Narcotics*, 403 U.S. 388 (1971).
[2]     Defendants' Motion Memorandum, ECF No. 165-1; Plaintiff's Response in Opposition, ECF No. 168; Defendants' Reply, ECF No. 174; and the attached exhibits and appendices.

## BACKGROUND[3]

On July 15, 2015, at approximately 6:00 a.m., Plaintiff Nathaniel Hicks, then a United States Secret Service Special Agent, was on-duty and parked on the shoulder of Maryland Route 295 North (the Baltimore-Washington Parkway). Fourth Cir. Op. 3, ECF No. 99-2. Agent Hicks was sitting in his Secret Service issued vehicle, waiting to join a government motorcade for the Secretary of the Department of Homeland Security. *Id.*; Am. Compl. ¶¶ 24-26, ECF No. 49-1. Sometime after 6:00 a.m., United States Park Police ("USPP") Officer Gerald Ferreyra pulled his police cruiser behind Agent Hicks's vehicle and approached the vehicle. Mem. Op. 3, ECF No. 87. As he approached, Officer Ferreyra noticed a handgun located on the passenger's seat of Agent Hicks's vehicle. *Id.* Officer Ferreyra drew his weapon, after which Agent Hicks quickly identified himself, showed his Secret Service credentials, and explained that he was on duty, waiting to join the motorcade. *Id.*

Despite having no "reason to doubt the validity of [Agent Hicks's] credentials," Officer Ferreyra called for assistance, and USPP Officer Brian Phillips and Sergeant Timothy Wallace (Officer Ferreyra's supervisor) subsequently arrived on scene. *Id.* at 4, 15. About 40 to 59 minutes later, and well after the motorcade had passed (and with it, Agent Hick's ability to carry out his assigned escort duties), the Officers returned to Agent Hicks his credentials and weapon and told him that he was free to go. Fourth Cir. Op. 4.

This freedom to go was short-lived, however, as the record indicates that Officer Phillips pulled over Agent Hicks minutes after he left the scene of his first detention, and detained Agent Hicks a second time. *Id.* at 4-5. Officer Phillips claimed that Agent Hicks was driving erratically

---

[3]    I provide here, for context only, a brief overview of the background of this case. For further background, see my Memorandum Opinion and Order on Summary Judgement, ECF No. 87, which can also be found at *Hicks v. Ferreyra*, 396 F. Supp. 3d 564 (D. Md. 2019), and the Fourth Circuit affirming opinion, ECF No. 99-2, reported at 965 F.3d 302 (4th Cir. 2020).

and illegally talking on his cellular telephone. Mem. Op. 6, ECF No. 87. Although Officer Phillips "concedes that he recognized [Agent] Hicks when he approached his car, he nevertheless demanded [Agent] Hicks's license and registration and detained him further before ultimately releasing him." Fourth Cir. Op. 5.

On July 8, 2016, Agent Hicks filed this *Bivens* action against Officers Ferreyra and Phillips. Compl., ECF No. 1. Defendants filed a dismissal motion seeking a finding of qualified immunity, which I denied in April 2017. ECF Nos. 37, 44. On July 28, 2017, Agent Hicks filed an amended complaint, adding a civil conspiracy cause of action under 42 U.S.C. § 1985. Am. Compl. In November 2018, Defendants filed a summary judgment motion, ECF No. 78, which was denied with regard to the *Bivens* claim and qualified immunity, but granted with regard to the civil conspiracy charge, ECF No. 87. The ruling was appealed, and on July 14, 2020, the Fourth Circuit affirmed in part and dismissed in part, finding that Defendants had waived their argument that Agent Hicks lacked a cause of action under *Bivens* because the issue had not been raised before this Court, and dismissing Defendants' qualified immunity arguments because they raised factual issues. Fourth Cir. Op. 2, 14, 17.

A jury trial was held from July 6-9, 2021. The jury found for the Plaintiff and made the following findings in a Special Verdict Form that included special interrogatories:

- Defendant Officer Ferreyra acted under color of law to violate Plaintiff Agent Hicks's constitutional rights under the Fourth Amendment during the first encounter with Agent Hicks.

- Officer Ferreyra's violation of Agent Hicks's constitutional rights under the 4th Amendment caused Agent Hicks to suffer compensatory damages for physical and/or emotional injury, which the jury awarded in the amount of $80,000 against Officer Ferreyra.

- Officer Ferreyra acted with malice or reckless indifference to Agent Hicks's federally protected 4th Amendment rights, and the jury awarded Agent Hicks punitive damages of $225,000 against Officer Ferreyra.

- Defendant Officer Phillips acted under color of law to violate Plaintiff Agent Hick's constitutional rights under the 4th Amendment during the first encounter with Agent Hicks and again when he stopped Agent Hicks during the second encounter.

- Officer Phillips' violation of Agent Hicks's constitutional rights caused Agent Hicks to suffer compensatory damages for physical and/or emotional injury, which the jury awarded in the amount of $125,000 against Officer Phillips.

- Officer Phillips acted with malice or reckless indifference to Agent Hicks's federally protected rights, and the jury awarded Agent Hicks punitive damages of $300,000 against Officer Phillips.

- The jury also made factual findings by answering special interrogatories as follows:

1. That Agent Hicks appeared to be asleep to Officer Ferreyra when Officer Ferreyra first approached the front passenger side of the 2014 Chevrolet Impala?

    __X___ YES                    _____ NO

2. That it appeared to Officer Ferreyra that Agent Hicks reached for the gun on the front passenger seat of the 2014 Chevrolet Impala in response to Officer Ferreyra knocking on the front passenger window?

    _____ YES              __X___ NO

3. That Officer Ferreyra knew that Agent Hicks was a Secret Service Agent once he properly verified his credentials?

    __X___ YES                    _____ NO

4. That Officer Ferreyra followed a customary practice within U.S. Park Police when he requested a supervisor's presence on the scene?

    _____ YES              __X___ NO

5. That Officer Phillips left the scene of the first encounter before Agent Hicks?

    __X___ YES                    _____ NO

6. That the totality of Officers Ferreyra and Phillips' actions were reasonably necessary at the scene of the first encounter?

    _____ YES              __X___ NO

4

7. That after leaving the scene of the first encounter, Officer Phillips observed a motorist driving erratically and talking on his mobile phone as he traveled northbound on I-295?

_____ YES          __X___ NO

8. That Officer Phillips realized it was Agent Hicks driving the vehicle prior to pulling the vehicle over?

__X___ YES          _____ NO

9. That Officer Phillips realized it was Agent Hicks driving the vehicle prior to demanding Agent Hicks's license?

__X___ YES          _____ NO

Special Verdict Form, ECF No. 150.

Defendants now move for this Court to (1) grant them qualified immunity; (2) enter judgment as a matter of law notwithstanding the jury's verdict on the basis that Plaintiff's claim represents an improper extension of the remedy set forth in *Bivens*, 403 U.S. 388; (3) order a new trial due to prejudice that resulted from the admission of indemnification evidence during Plaintiff's rebuttal closing argument; and/or (4) order a new trial *nisi remittitur* on the grounds that the compensatory and punitive damages award was excessive and unsupported by the evidence. Mot., ECF No. 165.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 50(b) provides that a party may file a renewed motion for judgment as a matter of law within twenty-eight days after entry of judgment, and a Court may:

(1) allow judgment on the verdict, if the jury returned a verdict;

(2) order a new trial; or

(3) direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b). When considering a motion under Rule 50, the court views the evidence in the light most favorable to the non-movant. *Gregg v. Ham*, 678 F.3d 333, 341 (4th Cir. 2012). The

court gives the non-movant the benefit of all reasonable inferences from the evidence, asks whether there is "substantial evidence in the record to support the jury's findings," but does not make credibility determinations or weigh the evidence. *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001); *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150-51 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## ANALYSIS

## I.      Qualified Immunity

Qualified immunity "protects law enforcement agents from federal claims when they act in objectively reasonable reliance on existing law." *Queen v. Prince George's Cnty.*, 188 F. Supp. 3d 535, 541 (D. Md. 2016) (quoting *Rockwell v. Mayor & City Council of Balt.*, No. RDB-13-3049, 2014 WL 949859, at *8 n.10 (D. Md. Mar. 11, 2014)). It "balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

"The doctrine shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Wingate v. Fulford*, 987 F.3d 299, 311 (4th Cir. 2021) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The defendant carries the burden of proving qualified immunity. *Id.* (citing *Meyers v. Balt. Cnty.*, 713 F.3d 723, 731 (4th Cir. 2013)).  To meet that burden, the defendant must show either that (1) no constitutional right was violated, or (2) "that the right was not clearly established at the time" the violative conduct occurred.  *Id.*

A right is clearly established when the law has "been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state."

*Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998) (citation omitted). "A right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *Wilson v. Prince George's Cnty., Maryland*, 893 F.3d 213, 221 (4th Cir. 2018). The Fourth Circuit has provided the following guidance when assessing whether a right was clearly established:

> [A court must] first look to cases from the Supreme Court, this Court, or the highest court of the state in which the action arose. In the absence of directly on-point, binding authority, courts may also consider whether the right was clearly established based on general constitutional principles or a consensus of persuasive authority. The Supreme Court has ruled against defining a right at too high a level of generality and held that doing so fails to provide fair warning to officers that their conduct is unlawful outside an obvious case.

*Ray v. Roane*, 948 F.3d 222, 229 (4th Cir. 2020) (citations omitted). The Supreme Court has stressed that the "specificity" of the legal principle is "especially important in the Fourth Amendment context." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). "Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Id.*

The Court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. In the context before me, a jury has found that the officers violated Agent Hicks's Fourth Amendment rights. At Defendants' request,[4] the jury was given special interrogatories for the purpose of deciding issues of fact necessary for me to determine qualified immunity. *See Yates v. Terry*, 817 F.3d 877, 882 n. 2 (4th Cir. 2016) (quoting *Willingham*

---

[4]    I note that Plaintiff objected to the use of special interrogatories, but his objection was overruled. *See* Pretrial Order 18-19, ECF Nos. 117, 131.

*v. Crooke*, 412 F.3d 553, 560 (4th Cir. 2005) ("Where 'a dispute of material fact precludes a conclusive ruling on qualified immunity at the summary judgment stage, the district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury.'").

The facts, as found by the jury, establish that during the first of the two encounters, Officer Ferreyra approached a vehicle parked at the side of the road and knocked on the front passenger window because the driver (Agent Hicks) appeared to be asleep.  Special Verdict, ECF No. 150. In response, Agent Hicks provided his Secret Service credentials, but he did not reach for his gun on the front passenger seat.  *Id.*  Thereafter, Officers Ferreyra and Phillips unreasonably detained Agent Hicks knowing that he was a Secret Service Agent.  *Id.*  Officer Ferreyra was not following a customary practice within the USPP when he requested a supervisor's presence on the scene.  *Id.* With regard to the second encounter, the jury found that Officer Phillips left the scene of the first encounter before Agent Hicks, and then pulled Agent Hicks's vehicle over and demanded his license.  *Id.*  Officer Phillips knew that it was Agent Hicks driving the vehicle before pulling the vehicle over, and he had not observed the vehicle being driven erratically nor did he observe the driver talking on his mobile phone.  *Id.*  The jury also found that both officers acted with malice or reckless indifference to Agent Hicks's Fourth Amendment rights.  *Id.*

Therefore, constitutional violations having been established, I shall focus my analysis on whether the rights violated by Defendants were clearly established in July 2015, beginning with the violation that occurred during the first encounter.  "The first step in determining whether a constitutional right is clearly established requires 'defin[ing] the precise right into which we are inquiring.'" *Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021) (quoting *Armstrong v. Village of Pinehurst*, 810 F.3d 892, 907 (4th Cir. 2016)).  The parties agree that it was reasonable under

the circumstances of this case—a parked vehicle with a driver who appeared to be asleep and a firearm visible on the passenger seat—for Officer Ferreyra to knock on the vehicle window and briefly detain Agent Hicks while checking his identification. *See* Mot. Mem. 4; Resp. 3, 5 n.3. However, Agent Hicks had the right to not be further detained without probable cause or even a reasonable, articulable suspicion once his identification had been established as a law enforcement officer authorized to carry a firearm. *See, e.g.*, *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (holding that a lawful traffic stop can become unlawful if it is prolonged beyond its purpose); *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (noting that a detention may last no longer than necessary to effectuate its mission).

"After defining the right, we ask whether the law 'is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Halcomb*, 992 F.3d at 320 (quoting *Armstrong*, 810 F.3d at 907). In my earlier decisions in this case, I held that the constitutional right not to be detained without probable cause was clearly established. *See* Mem. Op. 6-7, ECF No. 44; Mem. Op. 13-14, 17, ECF No. 87. Defendants argue that I must also consider the first two minutes of the encounter in the totality of the circumstances because what happened during that time explains "why" the first encounter lasted as long as it did. Mot. Mem. 4. However, the Defendants' subjective rationalization of their conduct is not relevant to whether their conduct was objectively reasonable. Regardless whether the stop was initially premised on a welfare check rather than suspicion of criminal activity, Defendants continued to detain Agent Hicks long after determining that he was an on-duty law enforcement officer who was legally authorized to carry a firearm. Under the particular circumstances facing Officers Ferreyra and Phillips, as found by the jury, and as described by the officers themselves, there was no probable cause to further detain Agent Hicks, and the Defendants had no reasonable suspicion of criminal activity. That it was an

unusual situation does not change clearly established law requiring probable cause or reasonable suspicion for Defendants to further detain Agent Hicks.[5]  Defendants do not argue that they made a mistake of fact or law but argue that it was reasonable to call a supervisor.  However, no reasonable officer would believe it was lawful to detain an individual without legal justification. And both Officers testified that they had received training regarding their obligations under the Fourth Amendment and that they understood that they could not detain a person in violation of the Fourth Amendment.  Tr. 73:5-13; 151:8-16, July 7, 2021, ECF No. 159. Therefore, qualified immunity is not available to Defendants under the circumstances of the first encounter.

 With regard to the second encounter, Agent Hicks had a Fourth Amendment right not to be stopped absent a "reasonable, articulable suspicion" that he had been, currently was, or was about to be "engaged in criminal activity." *United States v. Place*, 462 U.S. 696, 702 (1983). This right also was clearly established in July 2015. *See, e.g.*, *id.*; *United States v. Singh*, 363 F.3d 347, 355 (4th Cir. 2004) ("A reasonable suspicion exists when law enforcement officers possess a particularized and objective basis for suspecting the person stopped of criminal activity.").  It is simply not credible to suggest that a reasonable officer in July 2015 would not know that a vehicle stop required at minimum a reasonable suspicion of some criminal activity.

Based on the particular circumstances present in this case, Officer Phillips had no reasonable suspicion that Agent Hicks was engaged in criminal activity before pulling him over and demanding his license.  The jury found that Officer Phillips knew it was Agent Hicks before

---

[5]        The cases cited by Defendants are not to the contrary. *See* Mot. App'x A, ECF No. 165-6; Reply 5-6 (citing two recent excessive force cases).  None of the cited cases support the contention that an individual may be detained absent probable cause or reasonable suspicion.

stopping him.  Special Verdict 5-6, ECF No. 150.[6]  Officer Phillips has not carried his burden of establishing entitlement to qualified immunity under the circumstances of the second encounter.

Accordingly, Defendants' request for a grant of qualified immunity is DENIED.

## II.    Proper Extension of *Bivens*

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics* creates an implied cause of action under the Fourth Amendment for damages. 403 U.S. 388, 397 (1971). The Supreme Court also has recognized implied causes of actions in two other constitutional violation cases: a Fifth Amendment Due Process Clause claim for gender discrimination, *Davis v. Passman*, 442 U.S. 228, 248-49 (1979), and an Eighth Amendment Cruel and Unusual Punishment Clause claim for "failure to provide adequate medical treatment." *Carlson v. Green*, 446 U.S. 14, 19 (1980). However, while recognizing that *Bivens* is settled law in the area of law enforcement, the Supreme Court has adopted a different "approach to recognizing implied causes of action," and expansions of a *Bivens* remedy to a "new context or new category of defendants" is "a disfavored judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (citations omitted). After declining to extend *Bivens* to several other types of cases, the Supreme Court consequently adopted a two-part test in *Ziglar v. Abbasi* for courts to use in determining whether a *Bivens* remedy should be made available. *Id.* at 1857-60.

First, courts must determine if the case "presents a 'new *Bivens* context.'" *Tun-Cos v. Perrotte*, 922 F.3d 514, 522 (4th Cir. 2019). "If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new." *Abbasi*, 137 S. Ct. at 1859.

---

[6]    Defendants erroneously assert that the jury agreed that Officer Phillips observed a motorist driving erratically while talking on his cell phone. Mot. Mem. 7 (citing Special Verdict, Special Interrogatory No. 7). It did not.  The jury found by a preponderance of the evidence that Officer Phillips did **not** observe a motorist driving erratically while talking on his mobile phone.  Special Verdict 5, ECF No. 150.

A non-comprehensive list of factors to consider in analyzing whether the case differences are meaningful enough to create a new *Bivens* context includes:

> [T]he rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860; *see also Hernandez v. Mesa*, 140 S. Ct. 735 (2020) (recognizing that the list is not exhaustive and identifying "separation-of-powers principles" as being central to the analysis). Although differences may be slight, "[g]iven this Court's expressed caution about extending the *Bivens* remedy, . . . the new-context inquiry is easily satisfied." *Id.* at 1865. "If the context is not new—i.e., if the case is not "different in [any] meaningful way" from the three cases in which the Court has recognized a *Bivens* remedy—then a *Bivens* remedy continues to be available." *Tun-Cos*, 922 F.3d at 522-23.

Second, "if the context is new, then courts must, before extending *Bivens* liability, evaluate whether there are "special factors *counselling hesitation* in the absence of affirmative action by Congress." *Id.* at 523 (quoting *Abbasi*, 137 S. Ct. at 1857). The inquiry in determining whether there are special factors present is "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S. Ct. at 1857-58. Alternative remedies should also be taken into account. *See id.* at 1858 ("[I]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action."). A *Bivens* remedy is not available if any special factors which counsel hesitation are present. *Tun-Cos*, 922 F.3d at 523.

In creating this test, the *Abbasi* Court emphasized "that this opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose" and that "[t]he settled law of *Bivens* in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere." *Abbasi*, 137 S. Ct. at 1856-57.[7]

Plaintiff argues that he presents a "classic *Bivens* scenario that is no different from hosts of other *Bivens* claims that courts have consistently recognized." Resp. 9. And he notes the Fourth Circuit's comment when reviewing this case on interlocutory appeal—

> along *every dimension* the Supreme Court has identified as relevant to the inquiry, this case appears to represent not an extension of *Bivens* so much as a replay: Just as in *Bivens*, Hicks seeks to hold accountable line-level agents of a federal criminal law enforcement agency, for violations of the Fourth Amendment, committed in the course of a routine law-enforcement action.

*Id.* (quoting *Hicks*, 965 F.3d at 311 (emphasis added)). Defendants dismiss the Fourth Circuit's observations as *dictum* and irrelevant in light of its more recent opinion in *Annappareddy v. Pascale*, 996 F.3d 120 (4th Cir. 2021). Reply 9. Defendants contend that the facts of this case are meaningfully different from *Bivens* such that a new context is created, specifically: unlike the plaintiff in *Bivens*, Agent Hicks was never arrested; he was not asked to step out of his vehicle; neither he nor his vehicle or home was searched; he was allowed to retain possession of his car keys and phones; he was not physically harmed; and he was never handcuffed. Mot. Mem. 12. Additionally, they note that the seizure in this case was by law enforcement of other law enforcement, thereby creating a new context. *Id.* at 13.

---

[7]     *But see Hernandez*, 140 S. Ct. 750-52 (Thomas, J., concurring) (suggesting that it was time to consider discarding the *Bivens* doctrine).

Based on comparison of this case to *Bivens* using *Abbassi*'s suggested factors, I find that the facts of this case are not meaningfully different from *Bivens* and do not present either a new context or a new category of defendants.  First, the defendants in *Bivens* were line-level federal officers, as are the Defendants in this case.  *Annappareddy*, 996 F.3d at 135 (characterizing a claim against line-level investigative officers, and not high-ranking officials, as being like *Bivens*).

Second, *Bivens* involved the Fourth Amendment right to be free of unreasonable searches and seizures. 403 U.S. at 389-90. I approach the review of a new context with caution, understanding that a "claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernandez*, 140 S. Ct. at 743.  The Fourth Circuit recognized this distinction in *Annappareddy*, in which it distinguished *Bivens* as a seizure conducted without a warrant, which implicates a "distinct Fourth Amendment guarantee." 996 F.3d at 135. This case also involves a Fourth Amendment warrantless seizure, and the "right at issue" is not "meaningfully different from the one at issue in *Bivens* itself." *Id.* (quoting *Abbasi*, 137 S. Ct. at 1860).  While the traffic stop encounters at issue here are factually different from the "apprehension, detention, and physical searches at issue in *Bivens*," *id.* (quoting *Farah v. Weyker*, 926 F.3d 492, 499 (8th Cir. 2019)), it does not implicate a different legal standard—the requirement for the officers to have probable cause or reasonable suspicion for a seizure to be reasonable.  *See, e.g.*, *Whren v. United States*, 517 U.S. 806, 809 (1996) ("Temporary detention of individuals during the stop of an automobile by the police . . . constitutes a 'seizure.'"); *Terry v. Ohio*, 392 U.S. 1, 20 (1968) ("[t]he conduct involved in this case must be

14

tested by the Fourth Amendment's general proscription against unreasonable searches and seizures.").[8]

Further, although the authority under which the officers in *Bivens* acted was for narcotics violations, *Bivens*, 403 U.S. at 388, Fourth Circuit precedent suggests that legal mandates create a new *Bivens* context only if the authority is not generally criminal law. *See Tun-Cos*, 922 F.3d at 524 (holding that because ICE agents enforce immigration law rather than criminal law, the legal mandate the officers operated under was a new context under *Abbasi*); *Annappareddy*, 996 F.3d at 128, 135 (determining that in a case where plaintiffs were charged with health care fraud and aggravated identity theft, defendants in that case and in *Bivens* both "sought to enforce only ordinary criminal laws").  Here, Defendants also operated within the criminal law context. *See, e.g.*, ECF No. 87 at 15 (citing Md. Code Ann., Crim. Law § 4-203(a)(1), which prohibits vehicular handgun carrying and transportation on a highway, as authority giving Officer Ferreyra reasonable suspicion to investigate). This case therefore does not create a new *Bivens* context under this factor.

*Bivens* actions are "not 'a proper vehicle for altering an entity's policy.'" *Abbasi* 137 S. Ct. at 1860 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)).  The Supreme Court cautioned that "[e]ven if the action is confined to the conduct of a particular Executive Officer in a discrete instance, these claims would call into question the formulation and implementation of a general policy" which would "require inquiry and discovery" into the "discussions and deliberations that led to the policies and governmental acts being challenged." *Id.* The concern is that "the burden and demand of litigation might well prevent" future officials "from devoting the

---

[8]        As the Fourth Circuit noted in *Hicks*, the Fourth Circuit and other courts also have recognized Fourth Amendment *Bivens* claims that occurred in the context of a traffic stop. 965 F.3d at 311-12; *Schultz v. Braga*, 455 F.3d 470, 474-75, 480 (4th Cir. 2006) (analyzing other aspects of a *Bivens* claim where plaintiffs mistaken for robbery suspects were forcibly stopped in their vehicle); *McLeod v. Mickle*, 765 F. App'x 582, 583 (2d Cir. 2019) (analyzing other aspects of a *Bivens* claim where an officer "unreasonably prolonged an otherwise lawful traffic stop . . . to question McLeod about illegal drugs, call for a K9 unit, and perform a 'dog sniff' of his car").

time and effort required for the proper discharge of their duties." *Id.* The Fourth Circuit has held that an entity's policy was improperly contested in a *Bivens* claim in *Tun-Cos*, where the plaintiffs' complaint "specifically targeted the Trump Administration's immigration enforcement policy with the purpose of altering it," and contended that the "policy gave rise to the conduct that they alleged . . . was illegal." 922 F.3d at 527. Here, this factor does not create a new context because Agent Hicks challenged only the officers' specific actions, not the USPP's policy. Although Defendants argue that they acted in accordance with understood USPP policy by summoning a supervisor, the jury categorically rejected this claim, and found that Defendants were not following a customary practice within the USPP when requesting the supervisor's presence.   Special Verdict 5. Therefore, this case presents no risk of a disruptive intrusion by the Judiciary into the functioning of other branches.

The *Abassi* Court also suggests that courts evaluate "the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted."  137 S. Ct. at 1860. As already discussed above, the reasonableness standard for detaining an individual beyond the scope or purpose of a traffic stop, and the requirement for a reasonable suspicion before making a traffic stop, are clearly established in the law. There is certainly sufficient judicial guidance for the police officers to know that their actions in this case were improper. Given the extent of judicial authority on what constitutes a Fourth Amendment violation for traffic stops, this factor does not invoke a new *Bivens* context.

Defendants suggest that Agent Hicks's status as an on-duty federal agent risks a disruptive intrusion by the Judiciary into the functioning of the executive branch.  Mot. Mem. 13 n.5, 14. This argument is based on both plaintiff and defendants being federal officials, which Defendants argue requires me to "delve into the policies and procedures of both the U.S. Secret Service and

the U.S. Park Police."  Reply 12.  The Supreme Court has cautioned that "'courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs' unless 'Congress specifically has provided otherwise.'" *Abbasi*, 137 S. Ct. at 1861 (quoting *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988)).  In a recent case, the Fourth Circuit recognized a risk of Judiciary intrusion and subsequently declined to extend a *Bivens* claim to retaliatory detention in a prison, in part because it "would work a significant intrusion into an area of prison management that demands quick response and flexibility, and it could expose prison officials to an influx of manufactured claims." *Earle v. Shreves*, 990 F.3d 774, 780-81 (4th Cir. 2021). The *Earle* court held that "prison officials must have discretion 'to determine detention policies, to assess the endless variety of circumstances in which those policies may be implicated, and to decide when administrative detention is served and for how long.'" *Id.* at 780 (quoting *Bistrian v. Levi*, 912 F.3d 79, 94 (3d Cir. 2018)). Thus, the issue was "best left to correctional experts." *Id.* at 781.

Here, however, there are no implicated military or national security issues that risk disruptive intrusion by the Judiciary. *See Abbasi*, 137 S. Ct. at 1861; *see also Hernandez*, 140 S. Ct. 735 (holding that a *Bivens* claim involving a cross-border shooting implicates a risk of disruptive intrusion). Unlike *Earle*, the facts of this case with a law enforcement officer plaintiff do not present similar concerns of intruding into an area with the potential for a high-volume of this type of specific complaint and which would require institutional expertise and discretion to evaluate.  Moreover, the jury found that the officers were not operating under any official policy, Special Verdict 5, and this case does not require me to delve into either department's policies and procedures or analyze sensitive areas of specialized law.  Rather, it is a straightforward case of routine search and seizure law.  Agent Hicks's constitutional protections did not differ from any

other citizen's rights based on his employment as a law enforcement officer. There is no showing of a requirement for caution here. Indeed, "[t]he purpose of *Bivens* is to deter individual federal officers from committing constitutional violations." *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001).

Finally, even if the facts of this case presented a new *Bivens* context, no special factors counsel hesitation in permitting the *Bivens* claim. The "special factors" analysis focuses on maintaining the separation of powers. *Abbassi*, 137 S. Ct. at 1857 ("[S]eparation-of-powers principles are or should be central to the analysis."). "[T]he inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1857-58. For example, in *Abbassi*, the plaintiffs were suing high level executive officials and challenging the Government's response to the September 11 attacks, which implicated sensitive issues of national security. *Id.* at 1860-61. These types of concerns are simply not present in this case.

Here, Defendants again argue that because the parties involved were all active law enforcement officials working within the executive branch, it implicates separation-of-powers concerns. Mot. Mem. 14; Reply 12. And Defendants also argue that alternative remedies were available to Agent Hicks. Mot. Mem. 14-15; Reply 13. Defendants do not establish why Agent Hicks's law enforcement profession constitutes a special factor that counsels hesitation. The Fourth Circuit has recognized that interference with the "executive branch's investigative and prosecutorial functions" is a special factor in a *Bivens* claim. *Annappareddy*, 996 F.3d at 137. However, the intrusive elements which counseled hesitation by the *Annappareddy* Court appeared to be the fact that the case involved numerous investigator and prosecutor defendants that would require the court take "a wide-ranging dive into all actions taken by each actor as well as all

evidence available to investigators, prosecutors, judges, and juries" to evaluate the *Bivens* claim. *Id.* at 137-38 (quoting *Farah*, 926 F.3d at 500). No such extensive and intrusive inquiry is required here. Defendants also do not show how the Judiciary's evaluation of this *Bivens* case would burden the executive branch more than in a comparable case with a civilian plaintiff.

Defendants' argument regarding alternative remedies is also not persuasive. In accordance with *Abbasi*, 137 S. Ct. at 1858, the Fourth Circuit has recognized that the existence of an alternative remedial structure is a special factor that counsels hesitation. *Tun-Cos*, 922 F.3d at 526. The Fourth Circuit has suggested that even if the remedy does not directly address the constitutional violation, the question is "whether an elaborate remedial system . . . should be augmented by the creation of a new judicial remedy." *See id.* at 526-27 (quoting *Bush v. Lucas*, 462 U.S. 367, 388 (1983)) (discussing how the INA is a relevant alternative remedy even despite how it does not "redress constitutional violations that occur apart from removal proceedings"). If the remedy is unavailable to the plaintiff, "[t]he fact that Congress has expressly provided a damages remedy for some victims of this particular type of injury, but not for others, suggests that it considered the issue and made a deliberate choice." *See Annappareddy*, 996 F.3d at 137 (quoting *Farah*, 926 F.3d at 502).

Defendants argue that Agent Hicks had an alternative remedy available through the internal Secret Service investigation of the incident.  Mot. Mem. 14-15.  But, as Agent Hicks points out, an internal investigation that confirmed he "did nothing wrong during the encounter with Defendants is not an alternative remedial action that provides recourse against Defendants for their unlawful conduct."  Resp. 14.  Defendants cite no authority to suggest that any alternative remedy existed.

In sum, I do not find that this case differs in a meaningful way from previous *Bivens* cases, and I shall DENY Defendants' request for judgment as a matter of law on the basis that Agent Hicks's claim constitutes an improper extension of the remedy set forth in *Bivens*.

## III.   Indemnification Evidence in Rebuttal Closing

Defendants also move for a new trial, pursuant to Federal Rule of Civil Procedure 59, based on their assertion that "impermissible indemnification evidence [was] introduced during Plaintiff's rebuttal closing argument."  Mot. ¶ 3.  A party may challenge a jury verdict under Rule 59, but it is an "extraordinary remedy which should be used sparingly." *Pacific Ins. Co. v. American Nat. Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998).  Fed. R. Civ. P. 59(a)(1)(A) provides that "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Whether to grant a new trial "rests within the sound discretion of the trial court but such discretion must not be arbitrarily exercised." *City of Richmond v. Atl. Co.*, 273 F.2d 902, 916 (4th Cir. 1960); *see Atkinson Warehousing & Distrb., Inc. v. Ecolab, Inc.*, 115 F. Supp. 2d 544, 546 (D. Md. 2000), *aff'd*, 15 F. App'x 160 (4th Cir. Aug. 9, 2001).

The Court must "'grant a new trial[ ] if . . . (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.'" *Knussman v. Maryland*, 272 F.3d 625, 639 (4th Cir. 2001) (quoting *Atlas Food Sys. & Serv., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996)). Unlike a motion under Rule 50, when considering a motion for a new trial under Rule 59, "a trial judge may weigh the evidence and consider the credibility of the witnesses." *Poynter by Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989); *see also McCollum v. McDaniel*, 136 F. Supp. 2d 472, 475 (D. Md. 2001).  An

error is insufficient cause for a new trial unless the error caused prejudice. *See* Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial . . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); *DePaoli v. Vacation Sales Assocs., L.L.C.*, No. Civ. A. 2:04CV635, 2006 WL 1117799, at *10 (E.D. Va. 2006) ("[I]t is only errors that cause substantial harm to the moving party that justify a new trial, and errors that are not prejudicial do not necessitate a new trial."), *aff'd with modification of monetary award*, 489 F.3d 615 (4th Cir. 2007).

I shall begin this analysis with a review of the relevant events that occurred during the trial's closing arguments, beginning with Defendants' closing on July 8, 2021, after the jury had been instructed, and Plaintiff's counsel had finished her closing argument.[9] Defense counsel began with a description of how Officer Ferreyra was on his way home at the end of his shift and, seeing a car on the side of the road, he stopped.  Tr. 97:8 – 98:2, July 8, 2021, ECF No. 160.

> He approaches the car and what does he ultimately get?  He gets this*.  He gets a federal lawsuit where Agent Hicks ultimately is seeking to put a vacuum cleaner up to his bank account*.
>
> (Pause )
>
> [Defense counsel]:  *He gets a federal lawsuit seeking to have a vacuum cleaner put on his bank account to award damages that they don't even have the guts to put a number on.*  That's what he gets for doing his job.

*Id.* at 98:3-11.  Defense counsel then described Officer Phillips pulling over a car that was swerving:

> What does he get for it?  The same thing as Officer Ferreyra, a federal lawsuit seeking unspecified damages.

---

[9]      Portions of the transcript are italicized for emphasis.

> I mean, why can't a person come up and have the guts to say, this is how much money I want?  I suggest to you the reason is because their damage calculations, and we're going to get into that a lot in a few minutes, are so messed up that they can't even put a number on it. These is -- this was not a lawsuit against the United States.  It's not a lawsuit against the United States Park Police.  This is a lawsuit, personally, against these two officers.

*Id.* at 98:23 – 99:9.

Defense counsel continued to describe the Defendants' version of the events of July 2015.

> And all he did was say, I want a supervisor.  For that they want damages.  To have the nerve to say, I want a supervisor.  Are you [kidding] me?  *Come on, give him a half million bucks for asking for a supervisor.*  Heavens to Betsy.
>
> . . . .
>
> But think about this:  They talk about missing the motorcade.  What they're doing is they're saying, *they want you to award unspecified damages against these men personally* because it took too long for Sergeant Wallace to get to the scene.  That's really what it is.

*Id.* at 111:5-9, 111:24 – 112:2.

> Now, [Plaintiff's counsel] talks a lot about -- you know, again, the plaintiff doesn't have temerity to ask -- to put a number on anything.  And I sat there, I just sat there waiting through the whole case, huh, let's hear some damage, man.
>
> They didn't violate his rights, but I still want to know what their theory of damages is.  Go ahead, tell us.  I sat there waiting patiently.  What's your theory about damages?  And I even waited here today to figure out what it is.  And I still don't know.
>
> So isn't this great.  *You put two people at risk with their personal bank accounts.*  This is not a government lawsuit. *You put two people's families at risk to a back computer – bank accounts and they don't ask you for money or a dollar amount to give you any kind of guidepost as to how to parse things out. Seriously?*  That's what we're doing here.  Just come up with it, ladies and gentlemen.  You can figure this out.  Come up with it, a significant amount.

*Id.* at 115:23 – 116:14.

After Defense counsel finished his closing, court recessed prior to Plaintiff's rebuttal closing.  *Id.* at 125-26.  Before bringing the jury back in, Plaintiff's counsel raised an issue about Defense counsel's statements indicating that Defendants were personally liable.  *Id.* at 126.

> I would never have raised this in my initial opening, but I think defense counsel opened the door to it.  I have their interrogatory response where they acknowledge that the U.S. Government will cover any liability held against these defendants as long as they were acting within the scope of their employment during the pertinent time.  So I think it was inappropriate for defense counsel to suggest to the jury that these defendants were somehow - - their families are at risk, I think, is the argument made by a personal judgment.  He said it multiple times, which is not accurate and so I want to say something to the jury about indemnification and that a judgment would not come out of their pockets.

*Id.* at 126:21 – 127-7.  Defense counsel argued that Defendants "are not automatically indemnified at all and that's up to the U.S. Government to do that after they request it."  *Id.* at 127:11-13. Recognizing that it was also not automatic that Defendants would pay out of their own pocket, I stated:

> And so, that door has been opened and I'm going to let plaintiffs have an opportunity to address by, at least, saying that -- whatever the interrogatory answer is the interrogatory answer, so I'm going to allow that to be read in because I think that it does leave an impression with them.

> It also invokes sympathy in a way that's inconsistent with the way instructions were, so I think the door has been opened and I think that the manner of doing that makes it very succinct, because the interrogatory answers address that specifically.  And whatever the answer is is the answer that's given by, so I'm going to allow it.

*Id.* at 127:17 – 128:2. Defendants lodged no objection. Plaintiff's counsel then gave her rebuttal closing and responded to various points made by Defense counsel, including:

> Finally, I want to respond to defendants' claim that Agent Hicks doesn't have any damages, which is just not true. First, there's a process in a lawsuit called discovery where defendants and parties have to provide sworn responses to the other side's questions.  And

there was a question about who would cover the judgment in this case. Defendants are not personally covering the judgments in this case. Their families or whatever defense counsel said are not at risk. This is not a vacuum cleaner to their personal bank accounts. That statement was wrong.

[Defense counsel]: I object to that, Your Honor.

THE COURT: Why don't you read the interrogatory and the answer?

[Defense counsel]: You –

THE COURT: No, I'm not going to be hearing it. We'll have the interrogatory and the answer, and the jury can draw the inferences from it that they want draw.

[Plaintiff's counsel]: The question is, "If any person or entity may be liable to satisfy all or part of a possible judgment in this action or to indemnify or reimburse for payments made to satisfy any judgment in this action, describe the terms of any such agreement or arrangement."

And the sworn response was, "The U.S. Government will cover any liability held against Officer Ferreyra and Officer Phillips as long as he was acting within the scope of his employment during the pertinent times." And he certainly was, because he was on duty, both of these officers, as U.S. Park Police officers.

*Id.* at 131:3 – 132:5.

After the jury began deliberations, a question was submitted to the Court: "If we award any damages, will defendants be paying directly or will the government be paying?" *Id.* at 136-24 – 135:4. After sharing the jury's question with counsel, in the absence of the jury, I suggested the following:

Now, I'm not inclined to do more than just simply reiterate what two things they've already been told. Number one is, they have been told that it is agreed that the defendants were acting under color of state law. So that's one thing that they know. And we had the interrogatory answer that was read to them, and so they have that information. They have been told that information.

> I'm not going to add another instruction. I'm not inclined to add another instruction, because I think that we have to tell them that the only information they have, they've already been provided and they have to make the best choice they can based upon that.

*Id.* at 135:5-16. The parties responded:

> [Plaintiff's counsel]: That approach sounds good to us.

> [Defense counsel]: We agree, Your Honor.

*Id.* at 135:18-19. Before bringing in the jury, I repeated the approach to counsel.

> THE COURT: All right. Now, do we -- I want to – I want to refer to the instruction on -- under color of state law, that they were acting under color of state law, refer to the number and I want to -- I want to -- we can either just say, you have -- you had the interrogatory answer read to you and that information is already before you. Based upon those two things that will provide you with all the information that we can give to you about your question. Is that -- that's the approach I'm suggesting. No problem with that from you all.

*Id.* at 135:20 – 136:4. Neither party objected. I then brought the jury in and instructed them as

follows:

> Ladies and gentlemen, the question that we have that was provided to us this afternoon states, "If we award any damages, will the defendant be paying directly or will the government be paying?"

> What I want to -- what I can provide to you in response to your question is, is that the information that you have available to you to decide the case, you have already received and it's now -- the evidence is closed and we cannot give you new additional information you have not already received.

> There are two areas that you have already heard that can provide you with information that addresses the question you asked. The first is Jury Instruction Number 23, which is that there was an agreement, because Officers Ferreyra and Phillips were officers of the United States Park Police at time of events, they were acting under color of law. That has been established.

> So, that instruction you are not to single out as separate, apart from all the others. You have to consider that in addition to the everything else.

And the second piece of information you have already received from which you can do the best you can to move forward on this point is the interrogatory answer that [Plaintiff's counsel] read to you during her rebuttal where the interrogatory question asked the question that touches upon this issue and the response that was given. That information with this interrogatory – with this Jury Instruction 23 and all the other ones considered together should provide you with the information that we are allowed to provide you on that question, all right.

And now, we'll let you go on back and continue on with your deliberations

*Id.* at 136:16 – 137:21. The jury asked no other questions.

Defendants now assert that allowing the jury to receive evidence of indemnification, especially with no curative instruction, was prejudicial error. Mot. Mem. 15.  Defendants also assert that the interrogatory answer that was read to the jury was incomplete because it was based on Defendants' counsel's understanding and not a statement made by Defendants.  Mot. Mem. 17 n.8.  As Plaintiff correctly notes, however, this issue is a self-inflicted wound, as it was the Defendants themselves who opened the door during their closing argument by making multiple highly-charged emotional remarks about Defendants' bank accounts and families being put at risk for paying a damages award, clearly seeking to suggest to the jury—without any supporting evidence in the record—that the Defendants *would* be personally responsible to pay any judgment rendered against them, which was untrue, and was a clear appeal to the jury for sympathy to the Defendants, contrary to Jury Instruction No. 9, which cautioned against letting sympathy for either party rule their verdict. *See* Resp. 15.  And as Defendants themselves argued, "[t]he remarks of counsel were required to be confined to the evidence admitted in the case and reasonable inferences drawn therefrom." *Ayoub v. Spencer*, 550 F.2d 164, 170 (3d Cir. 1977).  Defendants' counsel's behavior warranted a response.

In a trial, if a defendant offers testimony of an inability to pay damages, a plaintiff will be permitted to introduce indemnification evidence. *See Jones v. Allen*, Civil Action No. PX–15–1173, 2016 WL 9443772, at *8 (D. Md. 2016) (citing *Lawson v. Trowbridge*, 153 F.3d 368, 379-80 (7th Cir. 1998); *Christmas v. City of Chicago*, 691 F. Supp. 2d 811, 819 (N.D. Ill. 2010)). In *Lawson*, the defendants introduced evidence of their inability to pay, but the trial court would not permit the introduction of indemnification evidence in response. 153 F.3d at 379. The appellate court ruled post-trial that a new trial on damages (not liability) was required because the defendants had "opened the door concerning who likely would pay any judgment against them, and the district court abused its discretion in not allowing [plaintiff] to rebut by telling the jury who likely would pay." *Id.* at 380. Of course, the situation that arose here is different because no evidence was introduced during trial, but rather Defendants raised the issue—not once, but several times—during closing arguments after the close of evidence. However, the principle remains relevant—a wrong impression left with the jury should be cured if possible, even by evidence that would not have been permitted under the general rule. Here, the only opportunity for any cure was through either a curative instruction[10] by the Court or in Plaintiff's rebuttal as requested.

Neither party asked for a curative instruction by the Court. Plaintiff proposed the reading of the interrogatory answer as part of the rebuttal closing. Although Defendants objected, they did not offer an alternative cure for the impression they had left with the jury, nor did they ask for any additional instruction in response to the reading. In my discretion, I determined that reading Defendants' own words to the jury was an appropriate response. The interrogatory answer was not provided to the jury as evidence and was not repeated in response to the jury's question.

---

[10]    The Fourth Circuit "has concluded that curative instructions eliminate prejudice from improper closing arguments . . . ." *United States v. Benson*, 957 F.3d 218, 235 (4th Cir. 2020).

Defendants note that the introductory sentence was not included in the reading, but they did not object at the time nor request that it be clarified.  The inclusion of the sentence also would not have changed the essential substance of the reading.  Finally, Defendants also note the post-trial confirmation from the U.S. Attorney's Office that indemnification is not guaranteed, but Plaintiff's counsel told the jury that "the U.S. Government will cover any liability held against these defendants . . . ."  Reply 1-2.  These were Defendants' own words that Plaintiff's counsel read to the jury.  Also, the confirmation from the U.S. Attorney's Office was not new information; Defendants argued at the time that Plaintiff proposed reading the interrogatory answer that indemnification was not automatic.  Neither was it automatic that Defendants would have to pay personally, which is what Defendants sought to have the jury believe in their closing argument. The jurors were given balancing information, and it was left in their capable hands to weigh the arguments and return a verdict.

Under the circumstances, I am not persuaded that the indemnification evidence read to the jury during Plaintiff's rebuttal argument to counter Defendants' improper arguments on damages resulted in prejudice to the Defendants or a miscarriage of justice.  Therefore, I shall not exercise my discretion to grant a new trial on damages.

## IV.   Excessive Damages

Finally, Defendants contend that the damages award was excessive and unsupported by the evidence.  Mot. Mem. 21.  Whether a jury award is excessive is a question of law. *Konkel v. Bob Evans Farms, Inc.*, 165 F.3d 275, 280 (4th Cir. 1999).  If the court finds that a jury award is excessive, it may "grant a new trial *nisi remittitur*, which gives the plaintiff the option of accepting the *remittitur* or of submitting to a new trial." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305

n.2 (4th Cir. 1998).  Under the process of *remittitur*, the Court orders a new trial unless the plaintiff

accepts a reduced damages award.  *Atlas*, 99 F.3d at 593.

"[J]ury determinations of factual matters such as . . . the amount of compensatory damages

will be reviewed by determining whether the jury's verdict is against the weight of the evidence

or based on evidence which is false."  *Id.* at 594.  The court considers the "miscarriage of justice"

prong when a defendant challenges the amount of punitive damages awarded, because "[t]he jury's

determination of the amount of punitive damages . . . is not a factual determination . . . but is,

rather, an almost unconstrained judgment or policy choice about the severity of the penalty to be

imposed."  *Id.*  Although it is based on "the jury's underlying factual determinations about the

defendant's conduct[,] . . . the factual record provides no direct foundation for the amount of

punitive damages."  *Id.* Therefore, "a court cannot generally test the amount of a punitive damage

award against record facts."  *Id.* Indeed, "policy-related elements—e.g., the likelihood that an

award will deter the defendant or others from engaging in similar conduct—are . . . more

appropriately decided by the trial judge," whose "unique vantage point and day-to-day experience

with such matters lend expertise and consistency." *Id.*  I shall address the damages arguments in

turn, first compensatory damages and then punitive damages.

### A.    Compensatory Damages

Monetary damages are available to Agent Hicks for the humiliation, embarrassment, and

emotional suffering that he experienced as a result of Defendants' Fourth Amendment violations.

*See Davis v. Passman*, 442 U.S. 228, 234, 245 (1979) ("Historically, damages have been regarded

as the ordinary remedy for an invasion of personal interests in liberty." (quoting *Bivens*, 403 U.S.

at 395)); *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) ("[C]ompensatory

damages may include not only out-of-pocket loss and other monetary harms, but also such injuries

29

as 'impairment of reputation . . ., personal humiliation, and mental anguish and suffering.'" (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974))).   However, Defendants contend that Agent Hicks failed to identify with any specificity how his alleged emotional injuries were tied causally to the unconstitutional conduct.  Mot. Mem.  24.  They also argue that there was no evidence that Agent Hicks sought or received medical attention, nor was there sufficient corroboration of his emotional distress.  *Id.* at 25.

Discussing damages for deprivation of constitutional rights under § 1983, the Fourth Circuit stated that compensatory damages "may not be presumed from every constitutional violation, but must be proven by competent, sufficient evidence." *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1250 (4th Cir. 1996) (citing *Carey v. Piphus*, 435 U.S. 247, 262-63 & n. 20 (1978)). The *Price* court indicated that sufficient evidence to prove compensatory damages can include testimony from the plaintiff:

> [A] plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress based on a constitutional violation; however, the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award of compensatory damages. In marshaling the evidence necessary to establish emotional distress resulting from a constitutional violation, *Carey* instructs us that "genuine injury" is necessary.

93 F.3d at 1254 (quoting *Carey*, 435 U.S. at 264).  Of course, "conclusory statements that the plaintiff suffered emotional distress" will not suffice.  *Knussman*, 272 F.3d at 640.  "The plaintiff must adduce sufficient evidence 'that such distress did in fact occur and that its cause was the constitutional deprivation itself and cannot be attributable to other causes.'" *Id.* at 639-40 (quoting *Price*, 93 F.3d at 1250).

In *Knussman*, the Fourth Circuit provided a number of factors to which a court may look to determine whether an award for compensatory damages is excessive. *Id.* They include:

> medical attention resulting from the emotional duress; psychiatric or psychological treatment; the degree of such mental distress; the factual context in which the emotional distress developed; evidence corroborating the testimony of the plaintiff; the nexus between the conduct of the defendant and the emotional distress; mitigating circumstances, if any; physical injuries suffered as a result of emotional distress; and loss of income, if any.

*Id.* at 640.  Agent Hicks credibly testified at trial about the emotional distress he suffered as a result of Defendants' Fourth Amendment violations.  Although Defendants argue that Agent Hicks's trauma was mostly (if not entirely) related to having a gun pointed at him, which was not the constitutional violation, Agent Hicks's testimony was not limited to his fearing for his life at the beginning of the first encounter.  He also testified about his humiliation at being detained and feeling belittled by the disparaging behavior (cursing, sneering, verbal assaults), as well as feeling upset and scared by the ordeal.  Tr. 85 – 92, July 6, 2021, ECF No. 158.  He testified that he felt alone and helpless, being the only African-American male surrounded by all Caucasian USPP officers and not knowing what might yet happen, especially once the motorcade passed by.  *Id.* He was embarrassed by his co-workers seeing him held on the side of the road when the motorcade passed by without being able to join it.  *Id.*  He explained that his work was a significant source of personal pride, and this was the first time in his 20-year career that he'd been unable to complete a work assignment.  *Id.*  Agent Hicks testified that he became emotionally upset by the events that day and that he later broke down and cried; he'd only ever cried before when his grandmother and father passed away.  *Id.*   He also stated that he was scarred by the two encounters and the emotional impact was still affecting him and impacting his relationships with his co-workers and family. *Id.* Agent Hicks described how the incidents made him fear for his family, especially given how easily

a situation could escalate with tragic consequences should his son or daughter be stopped by the police. *Id.* He testified that his sleep was negatively affected, and that he still wakes up reliving the experience in vivid detail. *Id.* And every time there's a media event of police misconduct, he relives the events of that day. *Id.* Further, Agent Hicks testified that he sought psychological counseling for the first time in his life, although because of his work travel, he only attended two sessions. *Id.*

Additionally, Agent Miltom Wilson[11] credibly testified about Agent Hicks's emotional injuries, having observed Agent Hicks about six weeks after the incidents looking distressed and subdued, which was inconsistent with prior encounters with Agent Hicks. *Id.* at 246 – 258. On being asked what was wrong, Agent Hicks related what had occurred in his encounters with the park police. *Id.* Agent Wilson followed up with Agent Hicks afterwards over the telephone and in person and noted further decline in his demeanor and emotional state. *Id.* The jury found Agent Hicks's testimony and Agent Wilson's corroborating testimony credible, as do I. There is sufficient evidence of genuine injury caused by the Plaintiffs' constitutional violations to support an award of compensatory damages. *See Carey*, 435 U.S. at 264 n.20 ("Although essentially subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others.").

Damages for emotional distress, humiliation, and embarrassment are "perhaps the most difficult damages to quantify. . . unique to each plaintiff." *In re Air Crash Disaster at Charlotte, N.C. on July 2, 1994*, 982 F. Supp. 1115, 1129 (D.S.C. 1997). There was no requirement for Agent Hicks to place a number on his suffering but rather leave it to the jury to quantify the harm in economic terms. *See Merriweather v. Family Dollar Stores of Ind., Inc.*, 103 F.3d 576, 581 (7th

---

[11]     Currently, Deputy Assistant Director Wilson but Agent Wilson at the time of the events being testified about.

Cir. 1996) ("We are not convinced that psychological injuries are readily amendable [sic] to such quantification, and forcing such a burden of proof upon a plaintiff would make compensatory damages nigh unto impossible to recover.").  The jury was instructed to "determine an amount of money that is fair compensation for Agent Hicks's damages."  Final Jury Instruction No. 33, ECF No. 148.   The jury was also instructed:

> You may award compensatory damages only for injuries that Agent Hicks proves by a preponderance of the evidence were caused by the Officers Ferreyra's and/or Phillips's allegedly wrongful conduct.
>
> The damages that you award must be fair compensation—no more and no less.
>
> You may award compensatory damages for any pain, suffering, or mental anguish that the Agent Hicks experienced as a consequence of Officer Ferreyra's and/or Phillips's actions. No evidence of the monetary value of such intangible things as pain and suffering has been, or need be, introduced into evidence. There is no exact standard for fixing the monetary compensation to be awarded for these elements of damage. Any award you make should be fair in light of the evidence presented at the trial.
>
> In determining the amount of any damages you decide to award, you should be guided by common sense. You must use sound judgment in fixing an award of money damages, drawing reasonable inferences from the facts in evidence. You may not award money damages based on sympathy, speculation, or guesswork.

*Id.*   The jury was also instructed that it could "award nominal damages if you conclude that the only injury that a plaintiff suffered was the deprivation of his constitutional rights, without any resulting physical, emotional or financial damage." *Id.* at 34.   According to the Fourth Circuit, I can assume that the jurors followed their instructions.  *Stamathis v. Flying J, Inc.*, 389 F.3d 429, 442 (4th Cir. 2004) ("A jury is presumed to follow the instructions of the court.").

I do not find that the jury's award of $80,000 against Officer Ferreyra, and $125,000 against Officer Phillips, for a total of $205,000 in compensatory damages is against the weight of the

evidence.  Although sizeable, the award is not beyond the outermost award that could be sustained

for the psychological harm suffered by Agent Hicks under these circumstances. And it appears

that the jury considered whether Officer Phillips caused additional mental anguish by stopping

Agent Hicks within minutes of him being released from the first encounter, no doubt experiencing

relief at being finally freed, only to be pulled over by Officer Phillips and further detained without

cause.   Therefore, I shall DENY Defendants' request for *remittitur* of the compensatory damages

awarded.

### B.    Punitive Damages

Punitive damages may be awarded in a *Bivens* suit.  *Carlson*, 446 U.S. at 21 (quoting

*Bivens*, 403 U.S. at 397).   In addition to punishing the wrongdoer, punitive damages serve as a

deterrent "and are especially appropriate to redress the violation by a Government official of a

citizen's constitutional rights." *Id.*  If an award is unconstitutionally excessive, it is the duty of the

court to set it aside. *Cline*, 144 F.3d at 306.  Here, the jury found that Officers Ferreyra and Phillips

"acted with malice or reckless indifference" to Agent Hicks's constitutional rights and awarded

punitive damages of $225,000 against Officer Ferreyra and $300,000 against Officer Phillips.  Jury

Verdict 2, 3.[12]

When, as here, a punitive damages award is challenged, the court considers three factors:

"(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the

actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the

difference between the punitive damages awarded by the jury and the civil penalties authorized or

imposed in comparable cases." *Wallace v. Poulos*, 861 F. Supp. 2d 587, 603 (D. Md. 2012)

---

[12]    The jury was instructed that they should consider the degree to which the Defendants "should be punished
for their wrongful conduct" as well as the degree to which an award "will deter Defendants or persons like them from
committing wrongful acts in the future."  Jury Instruction No. 35.

(quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)).  This analysis "ensure[s] that defendants have fair notice about the potential penalty they face for engaging in prohibited conduct"; without this notice, "the punitive damages award violates due process." *Id.* at 604.

> Under the first factor, the court considers

> > [W]hether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.* (quoting *State Farm*, 538 U.S. at 419).  Defendants argue that Agent Hicks was not physically harmed, was not targeted as being financially vulnerable, and that his injuries were the result of an isolated incident.  Mot. Mem. 29.  They also argue that there was no evidence of malice or of a reckless disregard for anyone's health or safety.  *Id.*   However, the jury unanimously concluded that Defendants' actions were not reasonably necessary and that they acted with malice or reckless disregard.  Jury Verdict 2, 3, 5.

Sufficient evidence supports the finding that Officer Ferreyra decided to detain Agent Hicks unnecessarily and deliberately cause him to miss his motorcade assignment with no probable cause or reason to investigate, knowing that Agent Hicks was an on-duty secret service agent. Officer Ferreyra did not consider the potential risk of danger to the motorcade's protectee due to preventing Agent Hicks from performing his duty. This was followed by abusive language, belittling and demeaning remarks, and spiteful, harassing behavior by both Defendants. And to add insult to injury, just moments after he was finally allowed to go, Agent Hicks was stopped again unnecessarily by Officer Phillips, who demanded his license and registration despite knowing who Agent Hicks was, and the demeaning behavior continued.  The harm was not

economic, nor was it physical, but the jury found that Agent Hicks was emotionally damaged by Defendants' actions.  Potential harm from the Defendants' actions must be also considered; for example, had Agent Hicks not stayed calm and controlled during the ordeal, these trying events could have led to a tragic outcome.  *See TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 460-61 (1993) ("It is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred.").  Causing emotional harm with malice is sufficient to support an award of punitive damages, and certainly, the type of behavior found by the jury is appropriate for both punishment and deterrence.

The second and third factors require me to review the ratio of compensatory to punitive damages, and the amounts of comparable verdicts.   *Wallace*, 861 F. Supp. 2d at 603.  As noted, the jury awarded Agent Hicks a combined punitive damages award of $525,000, which is less than three times the combined compensatory damages award of $205,000.[13]  The Supreme Court has affirmed as constitutional punitive damages awards "more than 4 times the amount of compensatory damages." *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23 (1991); *see also State Farm*, 538 U.S. at 425 ("Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution."); *BMW of North America, Inc. v. Gore*,  517 U.S. 559, 582 (1996) ("A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.").  Of course, the constitutional line is not "marked by a simple mathematical formula."

---

[13]     I note that each individual Defendant's ratios of punitive damages to compensatory damages are also less than 3:1.

*Gore*, 517 U.S. at 582.  Under the circumstances, punitive damages less than three times the amount of compensatory damages is in line with Supreme Court precedent.

Neither Defendants nor Plaintiff provide cases that can truly be considered comparable. Defendants cite *Butler v. Windsor*, in which I reduced a punitive award that was three times the amount of compensatory damages.  Mot. Mem. 29-30 (citing *Butler v. Windsor*, 143 F. Supp. 3d 332 (2015)). In *Butler*, however, I reduced the award because it was duplicative, not because it was excessive. *See* 143 F. Supp. 3d at 341-42 (reducing the punitive damages award of $50,000 on the state law claims to zero, but the $100,000 punitive damages award on the federal claim and $50,845 compensatory damages award were found reasonable).  In that case, I also analyzed numerous cases in the District of Maryland and the Fourth Circuit and found a "reasonableness range of $10,000 to $125,000 in punitive damages" per defendant in those cases dating from 2001 to 2014. *Id.* at 341.  Under the circumstances here, I find that the jury's award of punitive damages is not unconstitutionally excessive and does not "result in a miscarriage of justice," *Knussman*, 272 F.3d at 639, and I shall DENY Defendants' request for a new trial *nisi remittitur*.

## CONCLUSION

For the foregoing reasons, Defendants' motion, ECF No. 165, is DENIED.  Judgment shall be entered by separate order.


Dated: January 28, 2022.

                                         \_\_\_\_\_/S/_____
                                         Paul W. Grimm
                                         United States District Judge